Decided 30 January, 1906.

## LASSAS v. McCARTY.

84 Pac. 76.

PLEADING — WAIVER OF PLEA IN ABATEMENT.

1. Under the Oregon practice a plea in abatement must be separately filed, and is waived if joined with an answer to the merits of the case.

For instance: In a mortgage foreclosure suit a plea that the mortgage was not validly assigned to plaintiff will not be considered if joined with a plea in bar, but will be ignored.

EVIDENCE CONSIDERED.

2. The evidence does not show that the maker of the note and mortgage in question was so mentally incompetent when she executed those instruments as to be incapable of making a contract.

NONEXPERT EVIDENCE OF MENTAL CONDITION.

3. The weight to be attached to a nonexpert opinion as to the mental condition of a person whose capacity to contract is in issue is a question for the determination of the court or jury, by considering whether or not the facts testified to by the witnesses as a basis for their conclusions justify the opinions expressed.

BILLS AND NOTES — PRESUMPTION OF CONSIDERATION.

4. The presumption of the statute (B. & C. Comp. § 788, subd. 21), that a promissory note was given for a sufficient consideration, is of much importance in business transactions, and should not be lightly regarded in favor of those who have carelessly, or by being unduly confiding, set afloat commercial paper.

PROMISSORY NOTE — CONSIDERATION FOR PURCHASE — BONA FIDES.

5. Where, at the time a note for $1,500, secured by a second mortgage on certain real estate, was executed, the property was subject to a first mortgage for

$3,500, and at the time plaintiff purchased the note and mortgage it did not appear that the prior mortgage had been discharged, the fact that plaintiff purchased such second note and mortgage for $1,000, without knowledge of any fact that would tend to render the note invalid, did not deprive him of the right to enforce the note and mortgage as an innocent purchaser for value.

AMOUNT OF RECOVERY ALLOWED BONA FIDE HOLDER OF PROMISSORY
   NOTE OBTAINED FROM MAKER BY FRAUD.*

6. Under Section 4459, B. & C. Comp., providing that the holder of a negotiable instrument in due course may enforce payment for the full amount thereof against all parties liable thereon, a bona fide purchaser of a note and mortgage is not limited to a recovery of the amount paid therefor, but is entitled to enforce the same for the full amount due thereon, even though the execution of the note was induced by fraud and it was bought at a heavy discount.

ATTORNEY'S FEE IN NOTE—QUESTION ON EVIDENCE.

7. The amount to be allowed under the terms of a note providing for a reasonable attorney's fee in case of suit or action thereon must be determined by evidence, in case of dispute, and unless there is evidence, only the statutory fee should be allowed.

COSTS AND DISBURSEMENTS ON APPEAL.

8. The allowance of costs and disbursements on appeal in equity cases is entirely discretionary, and they will be apportioned as different circumstances may render proper: B. & C. Comp. § 566.

From Baker: ROBERT EAKIN, Judge.

Statement by MR. JUSTICE MOORE.

This is a suit by George Lassas against Lettie McCarty to foreclose a mortgage. The complaint states that the defendant, on November 21, 1900, gave to one G. L. Webb her promissory note for the sum of $1,500, payable in one year, with interest thereon at the rate of 8 per cent per annum, and to secure the payment thereof she at the same time executed to him a mortgage of certain real property in Baker County, which mortgage was duly recorded. Various assignments of the note and mortgage are set out, and it is alleged that on July 2, 1901, the plaintiff for a valuable consideration became the owner and holder thereof, and that no part of the debt so secured has ever been paid. The answer admits the making of the note and mortgage, but denies that they were given

---

*NOTE.—See 11 Am. St, Rep. 309-326 for monograph, Fraud in Inception of Negotiable Instruments as Affecting Bona Fide Holders, in the course of which is a discussion of the question how much may be recovered by a bona fide holder against a defrauded maker.                                        REPORTER.

·for any consideration, or that plaintiff is the holder thereof without notice, or that any condition of the mortgage has been broken. As a separate defense facts are stated which ·show that the execution of the note and mortgage were induced by the fraudulent representations of the original mortgagee, and that the several pretended assignments ¯were without consideration and with notice of such fraud. For a further defense it is alleged that at the time the note and mortgage were given the defendant's mind was ¯weak and she was easily imposed upon in business and ·financial matters, and that by reason of such incapacity, -superinduced by the fraudulent representations of Webb and his agents, she was imposed upon and induced to give the note and mortgage without any consideration ·therefor. The allegations of new matter in the answer having been denied in the reply, the cause was referred, .and from the testimony taken the court found that by reason of the defendant's mental condition and of the fraud practiced upon her the note and mortgage were void, and, having rendered a decree dismissing the suit, the plaintiff appeals.                REVERSED.

For appellant there was a brief and an oral argument ¯by *Mr. A. B. Winfree.*

For respondent there was a brief over the names of *H. E. Courtney, C. A. Moore,* and *C. W. Manville,* with an oral .argument by *Mr. Charles Allen Moore.*

MR. JUSTICE MOORE delivered the opinion of the court.

1. In support of the conclusion reached by the trial ·court, it is contended by defendant's counsel that as the pretended assignments of the mortgage were not evi- ·denced by written instruments, signed, sealed, witnessed, acknowledged, delivered and recorded, the plaintiff failed ·to show a right to maintain the suit, and hence the decree should be affirmed. It will be remembered that the

answer denies that the note and mortgage were assigned
to plaintiff.  The testimony shows that the note was as-
signed in blank by Webb, the payee, but that the persons
who severally owned the mortgage as an incident of the
note did not attempt to transfer it with the formalities.
required to convey real property.  It also appears that a
person who at one time held the note as collateral security
did not assign it to the owner thereof when the principal
debt was paid, but surrendered it to the owner, from whom
it passed in due course of business to the plaintiff.  Whether
or not the statute, providing that mortgages may be as-
signed by a written instrument, executed and acknowl-
edged with the same formalities as prescribed in deeds and
mortgages of real estate, and recorded as directed (B. & C.
Comp. §§ 5362, 5363), is controlling, we do not deem neces-
sary to a decision herein ; for if the mortgage was not.
transferred according to the established mode, the proper
manner to present the question was by a plea in abate-
ment (1 Chitty, Pl. *446; Pomeroy, Code Rem., 3 ed.,.
§ 697), but such defense having been joined with a plea
to the merits, which was in bar of the suit, the special
defense now insisted upon was waived : *Winter* v. *Norton*,
1 Or. 43 ; *Hopwood* v. *Patterson*, 2 Or. 49 ; *Murray* v. *Mur--
ray*, 6 Or. 26 ; *Chamberlain* v. *Hibbard*, 26 Or. 428 (38 Pac.
437); *Elder* v. *Rourke*, 27 Or. 363 (41 Pac. 6.); *Fiore* v.
*Ladd*, 29 Or. 528 (46 Pac. 144).

2.  Considering the case on its merits, the defendant, as
a witness in her own behalf, testified that in November,.
1900, she was the owner of a farm in Baker County which
was subject to a mortgage of $3,500, and, desiring to sell
the land, she listed it for that purpose with one James.
Cole, a real estate agent, who introduced G. L. Webb and
M. R. Hansen to her, saying he had secured purchasers
for her ranch ; that Cole and Hansen went with her to ex-
amine the land, and after returning the latter told her-

that Webb would buy the premises and pay her therefor $3,000 in cash, assume the payment of the mortgage of $3,500, and transfer to her the exclusive right to manufacture and sell a motor pump in certain counties in Utah, and that Webb also assented to and reiterated such offer; that she executed the note and mortgage in question in pursuance of an agreement on the part of Webb and Hansen that if they did not buy her farm they would at any time within six months return the note and mortgage, if she was dissatisfied with the transfer of the right to sell such pump in the counties named. The right in question was evidently valued at $1,400, for the further sum of $100 in cash was paid her as the consideration for the note and mortgage. This latter sum was advanced to enable her son to secure a model of the pump and to canvass the territory specified to sell the right assigned. She further testified that about three days after the note and mortgage were given Webb told her he had no money with which to buy her farm, whereupon she demanded a return of the instruments so executed, telling him she was dissatisfied with the transfer, but he asserted that he could not comply with her request, claiming that he had sold the note and mortgage to Hansen.

On cross-examination she said: "I knew I was signing a mortgage, but I didn't know I was executing an iron-clad note." She further said: "I don't remember ever signing a note." She also testified that she tendered to Webb the sum of $100 which she had received, but, as he refused to accept it, she had deposited that sum in a bank for him, where it had since remained. This witness on recross-examination testified as follows:

"Q. You did not understand the effect of those papers you say?
A. No, sir.

Q. You didn't even know what you were signing, did you?

A. I thought it would be a part of the payment upon the ranch:

Q. And was it to be a part payment upon the ranch?

A. Yes, if they would pay me three thousand in cash and assume the first mortgage as they promised, and that would bring it to the price I asked for it.

Q. And upon that understanding by you, you signed the note and mortgage, thinking it was part of the payment?

A. Yes, sir; I did."

The testimony further shows that no patent had been issued protecting the pump, which Webb claimed to have invented. He promised the defendant, however, that he would secure a patent therefor; but, so far as can be ascertained from the testimony, he failed in this respect. The testimony also disclosed that about 1890 the defendant's husband and a son were shot and killed at the same time.

Monroe Masters, appearing as defendant's witness, having testified that he had been acquainted with the defendant 30 years, her counsel, referring to the consequence of such deaths upon her, inquired: "What effect, if any, did that seem to have upon Mrs. McCarty's mind?" And he answersd:

"Well, it had a pretty bad effect upon her mind; she has not been the same woman that she was before.

Q. What is the condition of her mind at this time with reference to the transaction of business, and what has it been since Mr. McCarty's death?

A. Well, she has not been able to attend to her own business affairs. She has had to have other people do it.

Q. During this time has her mind been strong or weak?

A. It has been weak.

Q. State whether or not she is susceptible to undue influences in her business affairs?

A. Yes, sir; she is, and has been during all of this time.

Q. Are you able to state some instances of her susceptibility to such influence?

A. Well, in a business proposition she will ask you one thing, and then go and ask somebody else the same question, you know, and the last party always generally has the influence. Well, maybe just like she was going to rent her ranch, she will rent it to one man and then turn around and rent it to another before he gets it. She never remembers anything. Her memory is not long.

Q. What can you say in respect to her mind having decision or otherwise, firmness and the like?

A. Well, I think her mind is weak. I don't think she has any mind of her own at all. She has to ask everybody about what she does."

On cross-examination the witness was asked:

"Q. You spoke a while ago of Mrs. McCarty's renting this place first to one person and then to another. Do you know of your own knowledge any time when she rented the place to different parties at the same time?

A. Yes, sir; she rented it to me, and I done work on it for two weeks, and then she rented it to another fellow. We didn't have writings drawn up, but she told me I could have it, and I went upon the land."

The witness, W. C. Hindman, another acquaintance, testified that in his opinion Mrs. McCarty's mind had been weakened by the death of her husband and of her son, and in most other respects corroborates the testimony of the preceding witness, but he gives no particular instances of her alleged mental incapacity. M. J. Hindman, who had known the defendant several years, testified that he did not consider her capable of transacting her own business; that he knew of her paying a note when she held a receipt showing the payment thereof; that she owed on account of the purchase of real property $400, which sum the witness offered to loan her and tendered that amount to the person to whom it was due, but he refused to accept it, and she, by failing to pay that sum,

forfeited her right and surrendered the property, which is now worth about $5,000; and that she had settled a claim against a railroad company for damages on account of a personal injury for $1,000, when the witness had advised her that she should demand $2,500, and she had promised to do just what he told her. In other respects this witness corroborates the testimony of Masters and of W. C. Hindman.

That Mrs. McCarty was imposed upon by Webb and Hansen must be admitted. She executed the note and mortgage for a transfer of a pretended patent right that had no existence. Her mind was evidently somewhat impaired by the violent deaths of her husband and of her son occurring simultaneously, but we do not think the testimony shows such a state of mental weakness as to render her incompetent to enter into a valid contract. Her mental condition is to be determined from testimony of her acts and conduct at the time the note and mortgage in question were executed, and not from the opinions of witnesses in relation thereto. The only instances referred to by the witnesses as tending to show the state of the defendant's mind at or near that time are her renting a farm after she had orally leased it to another, her payment of a note for which she held a receipt, her failure to redeem certain real property when the money was offered her for that purpose, and her settlement of a claim for damages for a sum less than recommended. The testimony does not show that the defendant knew that Masters had taken possession of her farm, pursuant to a lease thereof, when she let the premises to another person. The note which she paid, when she held a receipt evidencing the payment thereof, may have been for a small sum and less than what she would have been obliged to pay an attorney as fees to defend an action, so that her settlement,

instead of disclosing mental weakness, may have proved superior wisdom. The testimony does not show what the real property was worth when the defendant declined to borrow $400 with which to discharge her obligation. The present value of that land, $5,000, may be sufficient to show that her refusal to borrow the money with which to pay the debt was unwise; but her acts in this respect afford no evidence of mental infirmity, for she may have concluded that the land was not worth more than the debt, and, since she could not then pay it, she may have preferred to surrender her right rather than to incur a personal obligation to a friend who offered to loan her the money. If an error of judgment as to the enhanced value of real estate is to afford conclusive evidence of mental incapacity sufficient to set aside a voluntary conveyance, it is safe to predict that few persons could be found who would be willing to risk investing their money in land. Whether the accepting of $1,000 as damages for a personal injury, instead of bringing an action to recover $2,500, with the delays and expenses incident thereto, shows weakness of mind, is a question upon which persons probably entertain differences of opinion. It might be thought by some that such settlement evidenced mental incapacity, while others might conclude that it manifested discretion and judgment.

3. The opinion of an intimate acquaintance is admissible in this State as tending to prove the mental condition of a person whose capacity to contract or whose responsibility for the commission of a crime is the subject of inquiry, but the reason for the belief entertained by the witness, upon the subordinate issue involved, must be given : B. & C. Comp. § 718, subd. 10. The degree of familiarity prescribed by the statute requires a personal knowledge of the facts upon which the opinion is based. The weight to be attached to such opinions, however, is a question for the court

or jury to determine, by considering whether or not the facts testified to by the witnesses as a basis for their conclusions justified the opinions expressed : Rogers, Expert Testimony (2 ed.), p. 160.   Each witness who testified upon this branch of the case was intimately acquainted with the defendant, and therefore qualified to express an opinion as to her mental condition, and the belief entertained by each was undoubtedly the result of an honest conviction.   A consideration of the reasons given by the witnesses does not convince us, however, that Mrs. McCarty's mind was so weak as to render her note and mortgage void.

4. The maintenance of the presumption that a promissory note was given or indorsed for a sufficient consideration (B. & C. Comp. § 788, subd. 21) justified the maxim invoked in *Bedell* v. *Herring*, 77 Cal. 572 (20 Pac. 129, 11 Am. St. Rep. 307), "that when one by his carelessness and undue confidence has enabled another to obtain the money of an innocent third person, he must answer for the loss which he has thus caused."

5. This brings us to a consideration of the question whether or not plaintiff secured the title to the note and mortgage under such circumstances as to render him an innocent purchaser thereof for a valuable consideration and without notice of the imposition practiced upon the defendant.   An examination of plaintiff's testimony shows that he purchased the note before maturity, paying therefor $1,000, which was two-thirds of its face value, without knowledge of any fact that would tend to render the negotiable instrument invalid.   It is argued by defendant's counsel that the sum paid for the note imparts notice of its infirmity, and hence plaintiff was not an innocent purchaser thereof.   It will be remembered that when the mortgage in question was given the premises were incumbered by a prior mortgage of $3,500.   Whether or not the earlier lien had been discharged when plaintiff secured an assign-

ment of the subsequent mortgage is not disclosed by the evidence. If it be assumed, however, that notice of any invalidity in the giving of a promissory note could be implied from a purchase thereof at a discount, the defendant should have introduced evidence tending to show that the security was ample for the payment of the entire debt evidenced by the instrument thus assigned: *Cannon* v. *Canfield*, 11 Neb. 506 (9 N. W. 693); *Citizens' Bank* v. *Ryman*, 12 Neb. 541 (11 N. W. 850). No evidence having been offered on this subject, it must be presumed that the prior incumbrance remains undischarged: B. & C. Comp. § 788, subd. 33.

6. It is insisted by defendant's counsel that as plaintiff paid only $1,000 for the note and mortgage, the execution of which was induced by fraud, the sum so paid and interest thereon is the limit of his recovery, and not the sum specified in the note. A diversity of judicial utterance exists on this important question, as will be seen by examing the authorities collated in the notes appended to the cases of *Bailey* v. *Smith* (Ohio), 84 Am. Dec. 385, and *Bedell* v. *Herring* (Cal.), 11 Am. St. Rep. 307. Whatever the rule may be in other jurisdictions, it is settled in this State by statute, enacted prior to the giving of the note and mortgage, that the holder of a negotiable instrument in due course may enforce payment for the full amount thereof against all parties liable thereon: B. & C. Comp. § 4459.

7. The written promise to pay a stipulated sum, given by defendant to Webb, contained a clause providing for the payment of such additional sum as the court might adjudge reasonable as attorney's fees in case suit was instituted to collect the note or any part thereof. The complaint alleges that $150 was a reasonable sum as attorney's fees for foreclosing the mortgage. The answer denies that any sum would be reasonable for that purpose. Upon this issue no evidence was offered by either party, and this

being so, the statutory fee only will be allowed : *Bradtfeldt v. Cooke,* 27 Or. 194 (40 Pac. 1, 50 Am. St. Rep. 701); *Cox v. Alexander,* 30 Or. 438 (46 Pac. 794); *First Nat. Bank* v. *Mack,* 35 Or. 122 (57 Pac. 326).

8. It follows from these considerations that the decree of the court below is reversed, and one will be entered here foreclosing the mortgage and ordering a sale of the premises, to pay plaintiff the sum due as evidenced by the promissory note, principal and interest, together with his costs and disbursements in both courts.          REVERSED.

---

Decided 4 December, 1905.