Argued August 20, reversed and remanded September 28, petition
for rehearing allowed November 29, 1973, former opinion partially
withdrawn; judgment of conviction affirmed, January 21,
petition for review denied March 19, 1974

# STATE OF OREGON, *Respondent, v.* PHILIP MARTIN DYER (No. 20772), *Appellant.*

514 P2d 363
518 P2d 184

*Robert C. Cannon,* Deputy Public Defender, Salem, argued the cause for appellant. With him on the brief was Gary D. Babcock, Public Defender, Salem.

*Thomas H. Denney,* Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Lee Johnson, Attorney General, and John W. Osburn, Solicitor General, Salem.

Before LANGTRY, Presiding Judge, and FOLEY and THORNTON, Judges.

THORNTON, J.

On July 31, 1972, in the Yamhill County Courthouse at McMinnville, defendant shot and killed his wife as they were waiting for a custody hearing to begin in the circuit court. Dyer also killed a female friend of his wife and fired two shots at a Yamhill deputy sheriff, who returned his fire and wounded him. At his trial Dyer relied on an insanity defense;

however, he was convicted by jury on two counts of murder and one of attempted murder.

Defendant appeals, alleging: (1) that it was error to change venue from Yamhill to Polk County because of the close proximity to McMinnville; (2) that certain lay witnesses should not have been allowed to express their opinions on Dyer's sanity as they were not shown to be intimate acquaintances; and (3) that it was error to deny defendant's motion for a mistrial on the ground that the prosecutor expounded an incorrect test of insanity in eliciting testimony from several witnesses as to defendant's sanity and in arguing the case to the jury.

■ Defendant's first assignment of error is without merit as defense counsel, who requested the change of venue, expressed no objection to having the trial moved to Polk County.

■ ■ Defendant's second assignment of error is likewise without merit. ORS 41.900 (10) permits intimate acquaintances to give their opinion respecting defendant's sanity. In this regard, "* * * it is within the discretion of the trial court to say when the witness has shown himself competent and qualified to express an opinion upon the subject * * *." *State v. Hansen,* 25 Or 391, 395, 35 P 976, 36 P 296 (1894); *accord, State of Oregon v. Garver,* 190 Or 291, 315, 225 P2d 771 (1950); *State v. Hassing,* 60 Or 81, 90, 118 P 195 (1911); *see also, State v. Skerl,* 250 Or 346, 442 P2d 610 (1968); *State v. Van Dolah,* 14 Or App 125, 512 P2d 1013 (1973).

The lay witnesses who expressed their opinion as to Dyer's sanity are sufficiently more intimate with defendant than the jailer who was permitted to express

an opinion in *Hansen.* The weight to be given to the testimony of the witnesses is for the jury to determine. *Lassas v. McCarty,* 47 Or 474, 482, 84 P 76 (1906); *State v. Skerl,* supra at 348.

We now consider Dyer's third assignment of error, relating to his insanity plea. ORS 161.295 (1) was adopted by the 1971 legislature and is based on § 4.01 (1) of the American Law Institute's Model Penal Code (1962). The new test of insanity contained in ORS 161.295 (1) represents a substantial change from the prior test in Oregon.[1]

ORS 161.295 provides:

"(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.

"(2) As used in chapter 743, Oregon Laws 1971, the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct."

Previously the test had been a liberalized version of the M'Naghten rule.[2] ORS 136.410 (repealed Oregon Laws 1971, ch 743, § 432); *State v. Garver,* supra at 298.

A formulation of the old test appears in the following jury instruction approved in *State v. Gilmore,* 242 Or 463, 410 P2d 240 (1966):

" 'Insanity, to excuse a crime, must be such a disease of the mind as dethrones reason and renders

---

[1] *See,* Proposed Oregon Criminal Code 34-37, Commentary, Art 5, § 36 (1970).

[2] *See,* Snouffer, *The Myth of M'Naghten,* 50 Or L Rev 41 (1970); State v. Layton, 174 Or 217, 148 P2d 522 (1944).

the person incapable of understanding the nature and quality and consequences of his act or of *distinguishing between right and wrong in relation to such act.*'" 242 Or at 468. (Emphasis supplied.)

In *Gilmore* the court also referred to the evidence which is customarily offered on the question of a defendant's insanity defense. The court said:

"* * * The evidence provided for the jury is usually, as it was here, the opinions of the experts called by the defendant that the defendant could not tell the *difference between right and wrong,* and the opinions of the experts called by the state that the defendant could tell the *difference between right and wrong* * * *." 242 Or at 466. (Emphasis supplied.)

This "right-wrong" test contained in *Gilmore* deals in terms of absolutes. The new test in ORS 161.295 (1) does not require absolute knowledge of the difference between right and wrong, only a substantial incapacity to appreciate criminal conduct. The Commentary to the Proposed Oregon Criminal Code 34, Art 5, § 36 (1970), which section became ORS 161.295, states that "an offender must be emotionally as well as intellectually aware of the significance of his conduct." Questions soliciting the answer that defendant knew right from wrong merely contemplate intellectual awareness. Whether a person "knows right from wrong" is not, as the state contends, a form, in simple lay language, of stating the first portion of the statutory standard in ORS 161.295 (1): whether the defendant has substantial capacity to appreciate the criminality of his conduct. It is the solicitation of opinion on the old, hence improper, standard.

Five times during the course of this lengthy trial the prosecutor, over objections by defendant,

solicited testimony from witnesses as to their opinion on whether Dyer knew right from wrong. Each witness said that he felt Dyer did know the difference. The following are the prosecutor's questions:

"[Prosecutor] Q. * * * [A]s a result of contact with him and your knowledge of his circumstances, did you, as a lay person, form an opinion about whether or not he had the ability to distinguish right from wrong?

"* * * * *

"[Prosecutor] MR. MOORE: Q. Mrs. Melson, what was your feeling about whether this Defendant had the ability to know right from wrong?

"[Mrs. Melson] A. I didn't ever think of it in those terms, but from my personal experience with him I felt he knew right from wrong.

"* * * * *

"[Prosecutor] Q. Mrs. Miller, based upon what you know about this Defendant, do you feel that he knew the difference between right and wrong?

"* * * * *

"[Mrs. Miller] WITNESS: Well, I feel that Phil would know the difference between right and wrong, but further than that I'm not qualified to state.

"* * * * *

"[Prosecutor] Q. Doctor, based on all of your contact with this Defendant and relying on your experience, do you have an opinion to a reasonable medical probability as to whether or not in connection with the charges against this Defendant he, number one, suffers from a mental defect or disease rendering him unable to know the difference between right or wrong?

"[Dr. Ragan] A. Yes, I have an opinion.

"Q. What's your opinion?

"A. I believe that Mr. Dyer in my association with him is able to distinguish right from wrong.

"* * * * *

"[Prosecutor] Q. So I take it then that as far as your opinion to a reasonable medical probability is concerned, that is, looking at all the facts that are available to you, your opinion is as you stated to the jury in answer to my question that this Defendant knew the difference between right and wrong and was able to conform his conduct to the law.

"[Dr. Ragan] A. I felt he did know right from wrong and that he could conform to it.

"* * * * *

"[Prosecutor] MR. MOORE: Q. Based on your acquaintance with the Defendant, did you ever reach or are you able to state an opinion as to whether or not Mr. Dyer is able to distinguish right from wrong?

"[Officer Milbradt] A. Well, at all the time I've known Mr. Dyer, I never knew him to do anything wrong. I've discussed this part with him, the present, visited with him, and I would say it's my opinion that Mr. Dyer definitely does know right from wrong. I've never even so much as saw him walk against a red light in the City of Mc-Minnville."

It should also be mentioned that following the 'Does he know right from wrong' questions by the prosecutor quoted above, defense counsel employed the same term in at least three instances in referring to the same matter during cross-examination of the same witness.

During his final closing argument the prosecutor recalled the above testimony and stressed to the jury that each of these witnesses believed that Dyer could tell right from wrong. Defendant's motion for a mistrial, based on the above argument by the prosecutor, was denied. The trial court did not instruct the

jury to disregard the prosecutor's references to the "right-wrong" test nor did it instruct the jury that the "right-wrong" test is not the present test of criminal responsibility in Oregon. However, the court did give an insanity instruction repeating the language of the statutory standard in ORS 161.295 (1). The court also granted defendant an exception to the court's failure to instruct the jury that the "right-wrong" test was not the current test of insanity in Oregon.

■ Defendant argues that the prosecutor's repeated reference to the "right-wrong" test of criminal responsibility created confusion as to the proper standard to be applied by the jury and was therefore prejudicial to the defendant.

■■ We agree. The prosecutor has a duty to see that the defendant has a fair trial. *State v. Pointer et al.*, 106 Or 589, 213 P 621 (1923). Objectionable remarks by the prosecutor, if left uncorrected, may be ground for reversal. *State v. Wilson*, 221 Or 602, 351 P2d 944 (1960). Further, the new standard in ORS 161.295 (1) is substantially different from the "right-wrong" test, as set out in *State v. Gilmore*, supra at 468. Therefore the jury may have been sufficiently confused by the prosecutor's remarks as to apply the wrong standard in its deliberations.

Under the circumstances we believe that it was incumbent upon the trial judge to take affirmative steps to remove possible confusion caused by the prosecutor's repeated references to the old "right-wrong" test. Inasmuch as the court did not take affirmative action to eliminate the confusion, either by instructing the jury that the "right-wrong" test was not applicable or by allowing the motion for mistrial, we conclude

that the case must be sent back for a new trial. *State v. Seeger,* 4 Or App 336, 340, 479 P2d 240 (1971). *Cf., State v. Dennis,* 177 Or 73, 159 P2d 838, 161 P2d 670 (1945); *State v. James Edward Smith,* 4 Or App 261, 478 P2d 417 (1970).

Reversed and remanded.

**ON PETITION FOR REHEARING**

Robert C. Cannon, Deputy Public Defender, Salem, argued the cause for appellant. With him on the brief was Gary D. Babcock, Public Defender, Salem.

Thomas H. Denney, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Lee Johnson, Attorney General, and John W. Osburn, Solicitor General, Salem.

Before Schwab, Chief Judge, and Langtry, Foley, Fort,* Thornton and Tanzer, Judges.

TANZER, J.

Our original opinion in this case reversed the judgment of conviction because the "prosecutor's repeated reference to the 'right-wrong' test of criminal responsibility created confusion as to the proper standard to be applied by the jury and was therefore prejudicial to the defendant." We granted the state's petition for rehearing in banc and, having heard the issue reargued, we withdraw that portion of the opinion dealing with defendant's third assignment of error and affirm the judgment of conviction.

Under ORS 161.295 (1), the new test of criminal responsibility is in two parts:

> "A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law."

Our original opinion concluded that the prosecu-

---

* Fort, J., did not participate in this opinion.

tor's questions may have led the jury to confuse the new test with the old Oregon version of the M'Naghten rule and that the court should have instructed them not to apply the old rule. Upon reargument, the Public Defender argued additionally that the jury may have been confused because the second element of the new test, relating to defendant's capacity to conform his conduct to the law, was not given equal emphasis to the first element requiring capacity to appreciate criminality. Upon reconsideration, we hold that this record does not justify a conclusion that the jury may have been confused in either respect.

The first element of the new standard of criminal responsibility is the functional equivalent of the former test in Oregon which was defined in *State v. Gilmore,* 242 Or 463, 468, 410 P2d 240 (1966):

> " 'Insanity, to excuse a crime, must be such a disease of the mind as dethrones reason and renders the person incapable of understanding the nature and quality and consequences of his act or of distinguishing between right and wrong in relation to such act. * * *' "

That language states in different words the first element of ORS 161.295 (1), which excuses crime if "as a result of mental disease or defect [defendant] lacks substantial capacity * * * to appreciate the criminality of his conduct * * *."

■ The dissent disputes the equation of the old and new Oregon tests by pointing to Section A of the Commentary to the Proposed Criminal Code 34, § 36, which discusses the difference between the new rule and the M'Naghten rule. That difference is summarized by the substitution of the new word "appreciate" for M'Naghten's word "know." The significance of the change is

that the word "appreciate" allows psychiatric testimony regarding emotional as well as intellectual cognition of the criminality of the conduct.

The dissent ignores, however, a prior change in the law of Oregon which is acknowledged in Section C of the Commentary at 36 which compares the new law to the law of Oregon rather than to M'Naghten. Oregon long ago liberalized its version of the M'Naghten rule by substitution of the word "understand" for M'Naghten's "know." *See*, e.g., *Gilmore*, supra. The use of the phrase "right and wrong test" has been merely a shorthand reference, *see State v. Layton*, 174 Or 217, 226, 148 P2d 522 (1944), and *State v. Wallace*, 170 Or 60, 77-78, 131 P2d 222 (1942), and not a statement of the rule itself. The effect of the word "understand" in the *Gilmore* formulation is to allow a full range of testimony as to emotional as well as intellectual cognition of the act, a practice which the drafters wished to continue by using "appreciate." As they explained in the Commentary:

> "It should be noted that this formulation [quoted above from *Gilmore*] is somewhat more liberal than the original *M'Naghten* rule. The Oregon test speaks of lack of capacity for 'understanding' the nature of the act. *This would seem to allow a full examination of the mental condition of a defendant on not only the intellectual awareness of his acts but also the emotional awareness.* The word 'know' in the psychiatric sense is understood to be not limited to intellectual awareness. Psychiatrists uniformly insist that it is possible for a person to 'know' intellectually what he is doing but not to 'know' it emotionally, and, if either of the two levels of 'knowledge' is missing, a person qualifies as insane under the test. *By using the word 'understanding' in the Oregon formulation this subtle, yet highly significant distinction of levels*

*of knowledge seems to be incorporated.* \* \* \* Psychiatrists testifying at the trial \* \* \* are, as a practical matter, able to testify as to both the intellectual and emotional awareness of the defendant. And the juries, in actual practice, then consider all such testimony." (emphasis supplied)

While we are hard put to articulate the difference between intellectual and emotional understanding or appreciation of criminality—and there is no need to enter that semantic thicket in this case—the definitions found in *Gilmore* and in ORS 161.295 (1). each allow testimony as to both levels of cognition and the two definitions are therefore equivalent to each other in meaning and in function.

Professor George Platt, who served as reporter for the Criminal Law Review Commission on the responsibility section, verified this conclusion in his testimony to the Senate Committee on Criminal Law and Procedure, according to the minutes of their consideration of the new law, that:

> "The text proposed in the Code is the Model Penal Code version and it is essentially the M'Naghten rule with respect to the actor's knowledge of his acts but it is an extension of M'Naghten in that it does have a control test; it does go to the volitional aspect of any actor's makeup."

The only change in the cognition portion of the test is the requirement that the defendant's capacity for appreciation only be "substantially" impaired. The purpose, again, is to assure a greater range of expert testimony than was permissible under the more absolute M'Naghten rule, Model Penal Code § 4.01 Comment (Tent. Draft No. 4, 1956), but which was already the practice in Oregon under *Gilmore*.

The benefit of legislative purpose was fully ac-

corded to the defendant in this case. Dr. Voiss testified comprehensively and without restriction for a day and a half as to the defendant's history and mental state. His testimony was not confined within hypertechnical legal boundaries—indeed he testified without objection that the defendant was "crazy as hell," but there is no claim that such testimony comports with any rule of criminal responsibility, old or new.

■ The language employed by the prosecutor in questioning the non-psychiatric witnesses was as relevant under the new standards of criminal responsibility as it would have been under the old. The Commentary to the Proposed Criminal Code 36, § 36, recognizes that the word "know" is used by litigants in its broad sense as a means of eliciting generalized descriptions of a defendant's condition, free from the relevancy constraints of overly technical legal definitions, allowing the jury to "make its own 'common sense' determination of the word's meaning." The phrasing chosen by the prosecutor in this case, "whether or not he had the ability to distinguish right from wrong," whether "he knew the difference between right and wrong," whether he "suffers from a mental defect or disease rendering him unable to know the difference between right and wrong," whether "this Defendant knew the difference between right and wrong," and "whether or not Mr. Dyer is able to distinguish right from wrong," were all relevant and proper under either the new or the old tests of criminal responsibility.

Similarly, the consistent answers by the prosecution's witnesses that the defendant had the actual ability to distinguish between right and wrong at the time of the homicides were clearly relevant in deter-

mining under ORS 161.295 (1) whether he had the substantial capacity to do so.

Because the first element of the new standard of criminal responsibility is the functional equivalent of Oregon's former test, although stated in different language, there is no difference in that respect which could have confused the jury.

As to the second form of possible jury confusion, nowhere do we find that the prosecutor's conduct was such as to indicate to the jury that the ability to appreciate criminality is the only test or even the primary test, so as to cause the jury to ignore or minimize defendant's claim under the second element of the new test relating to his capacity to conform his conduct to the law.

The original opinion sets out the testimony of four state's witnesses, each of whom expressed an opinion that defendant knew right from wrong at the time of the killings. In the case of three of those four non-psychiatric witnesses, the very following question dealt with the second element of the test and they each expressed an opinion that defendant could have obeyed the law had he chosen to do so.[①]

---

[①] In questioning Mrs. Melson, the next question and answer succeeding that set out in the original opinion was:

"Q. Did you feel that he had the ability to obey the law?
"A. Yes."

The next succeeding question and answer in Mrs. Miller's testimony was as follows:

"Q. Do you think that the Defendant had the ability to obey the law when he wanted to?
"A. Well, I think he could if he wanted to, yes, because he had been doing it."

Immediately following the first pair of questions and answers of

The state also offered the psychiatric evidence of Dr. George Suckow who testified extensively, indeed for 127 pages of transcript, as to the defendant's condition relating to both elements of the test for criminal responsibility. Dr. Suckow took pains to specify that his testimony was given in light of the new rules of criminal responsibility:

"Q. With reference to the defendant in this case, based on your past contact with him and the records available to you from the Oregon State Hospital as well as from other sources, were you asked to conduct an examination of the Defendant for the purpose of determining his mental responsibility?

"A. Yes, I was.

"Q. And specifically were you requested to conduct an examination for the purpose of determining whether or not he had the ability to — whether or not his ability to appreciate the criminality of his actions was substantially impaired due to mental disease or defect?

"A. Yes, I was.

"Q. And were you also by the same token to examine the Defendant to determine whether or not his capacity to conform his conduct to the law was substantially impaired?

"A. Yes.

---

Dr. Ragan which are set out in the original opinion, is the following:

"Q. And with specific reference to whether or not the Defendant suffered from mental disease or defect that would substantially impair his ability to conform to the law, do you have an opinion on that?

"A. With my contact with him, I felt he was able to conform to the established law."

The redirect testimony of Dr. Ragan, as set out in the original opinion, refers to both of the twin tests.

"Q. And did you reach an opinion based on your examination and also on your past contact with the Defendant?

"A. Yes, I did.

"Q. What is your opinion?

"A. It's my opinion that he does not have any mental disease or defect that substantially impairs his ability to appreciate the potential criminality of his conduct or to conform his conduct to the requirements of law. In other words, he is essentially responsible and capable of behaving if he chooses to.

"* * * * *

"Q. [by defense counsel] And do you understand the test in Oregon to be the rightfulness and wrongfulness of his conduct?

"A. No, that used to be the test under the M'Naghten Rule, but it changed in January of 1972. Now it's substantial capacity to appreciate the criminality of his conduct, although I personally like to say potential criminality."

Upon argument, defense counsel raised the subject of criminal responsibility by telling the jury:

"Your difficulty, however, it seems to me then becomes apparent in the fact that you must focus your attention on the question first: Was the Defendant criminally responsible at the time of these acts? Now, this question has a two-part aspect to it. First, you have to ask yourselves: Was he suffering from a mental disease or defect to the extent that he lacked the substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law? * * *"

The prosecutor, in his turn, dealt with both issues of criminal responsibility with clarity and balance throughout his argument to the jury. We do not find,

as does our dissenting brother, a "stress" on " 'right-wrong.' " For example, the prosecutor argued:

> "Now, this matter of whether or not the Defendant is diagnosed as a psychotic is not an empty exercise in the context of what we're talking about here. * * * But the question is in determining whether or not the individual is out of touch with reality to the extent that he cannot conform his conduct to the law and to the extent that he cannot appreciate that what he is doing is criminal. * * *"

In arguing the testimony of the witnesses, the prosecutor commented upon the report of Dr. Dewey:

> "* * * [I]t does not contain an opinion that this man was unable to appreciate the criminality of his conduct or unable to conform his conduct to the requirements of the law."

Of another witness, he argued that:

> "Gail Melson testified as to her opinion about this Defendant's ability to conform his conduct and to appreciate right from wrong * * *."

Regarding Mrs. Miller, he argued:

> "* * * But her opinion was that this Defendant knew right from wrong and could obey the law if he wanted to. * * *"

Regarding Dr. Ragan, who had treated the defendant, the prosecutor argued:

> "* * * [H]is testimony was that Phil [the defendant] knew right from wrong and that Phil could conform his conduct to the law. * * *"

In referring to a comment by the defendant after the homicides that "[w]hen I do something, I really do it big. I got me a cop too," the prosecutor argued:

> "* * * Is that the statement of a man that

doesn't remember? Is that the statement of a man that doesn't know the criminality of his conduct? Is that the statement of a man who cannot conform, or is that the statement of an anti-social personality, a flat, plain criminal like so many others who is proud of killing a policeman?"

Following argument, the court instructed the jury as to both aspects of criminal responsibility in the words of the statute.

We see no possibility that the prosecutor's conduct or any other factor in the trial of this case would have confused the jury into relying upon obsolete law nor solely upon the cognition element of the new rule of criminal responsibility and ignoring the volition element. For these reasons the portion of our original opinion dealing with the third assignment of error is withdrawn, those portions dealing with change of venue and competency of lay witnesses stand unchanged, and the judgment of conviction is affirmed.

Former opinion partially withdrawn; judgment of conviction affirmed.

THORNTON, J., dissenting.

A close study of the language of ORS 161.295⊙ plus the Commentary to the new Oregon Criminal Code of 1971 will show that contrary to the conclusion of the majority opinion, the first element of the new standard for determining criminal responsibility is not the "functional equivalent" of the former test in Oregon.

The Commentary shows that the Criminal Law Revision Commission, at the urging of the various experts in the field of criminal insanity, decided to recommend the abandonment of the old test, which was a modified version of M'Naghten, and in its stead

to recommend the adoption of a new and different standard. It seems to me that the majority opinion has all but nullified the first part (identified as "[a]" in the quoted section①) of the new test for determining insanity enacted by the 1971 legislature, and, in effect, has returned us to the former test. I would adhere to our former opinion in this case, *State v. Dyer,* 16 Or App 247, 514 P2d 363 (1973).

As the Commentary specifically points out, under the new law the determination of criminal insanity (irresponsibility) is no longer dealt with in terms of absolutes. In *State v. Gilmore,* 242 Or 463, 410 P2d 240 (1966), the Supreme Court set forth our prior test in terms of absolutes—whether the defendant *did or did not know the difference* between right and wrong (former ORS 136.410). ORS 161.295 (1) does not require this absolute knowledge. Instead the determination of responsibility commences with a two-part inquiry: (1) Did the defendant have *intellectual* awareness of the potential criminality of his conduct and (2) if so, did the defendant have *emotional* awareness of the potential criminality thereof?

The following are some of the statements in the Commentary:

"The draft section substitutes 'appreciate' for *M'Naghten's* 'know,' thereby indicating a preference

---

①

"(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either [a] to appreciate the criminality of his conduct or [b] to conform his conduct to the requirements of law.

"(2) As used in chapter 743, Oregon Laws 1971, the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct." ORS 161.295.

for the view that an offender must be emotionally as well as intellectually aware of the significance of his conduct * * *.

"In addition the section requires only 'substantial' incapacity, thereby eliminating the occasional references in some of the older cases to 'complete' or 'total' destruction of the normal cognitive capacity of the defendant.

"* * * * *

"* * * The word 'know' in the psychiatric sense is understood to be not limited to intellectual awareness. Psychiatrists uniformly insist that it is possible for a person to 'know' intellectually what he is doing but not to 'know' it emotionally, and, if either of the two levels of 'knowledge' is missing, a person qualifies as insane under the test * * *." (At 34, 36.)

The new test is highly sophisticated and not an easy concept to grasp. This is so because, as I have just pointed out, it is based on unfamiliar, technical psychiatric terms. This is why expert psychiatric testimony is sought and is so essential. See, Minutes of Criminal Law Revision Commission, January 18, 1969, p 2.

The psychiatrists who testified in this case did not agree in their opinions of Dyer's sanity. Dr. Suckow testified that Dyer was able to appreciate the criminality of his act. Dr. Voiss, on the other hand, testified that Dyer could not, at the time he killed his wife, appreciate the criminality of such conduct. Dr. Voiss expressed the opinion that Dyer was under "a severe emotional disturbance or distress or pressure at that time beyond his control and relating to a pre-existing lifelong mental disease or defect."

The questions soliciting lay opinions that Dyer knew right from wrong tended to contradict and confuse the expert testimony on the correct standard.

In summary, the net effect of the prosecutor's questions concerning "right-wrong," together with the stress the prosecutor placed on the answers in his closing argument, could only have the result of confusing a jury which had the responsibility of determining the ultimate question—did Dyer have "substantial capacity" "to appreciate" or "to conform"?

The majority opinion disregards the clearly expressed intention of the Criminal Law Revision Commission to draft a substantially different test, and now concludes that all the legislature did was add a second part—"conform"—to the old "right-wrong" test. I cannot agree.