Argued and submitted March 18, resubmitted en banc December 3, 2014, affirmed January 22, petition for review allowed June 4, 2015 (357 Or 324) See later issue Oregon Reports

In the Matter of J. C. N.-V.,
a Youth.

STATE OF OREGON,
*Petitioner-Respondent,*

*v.*

J. C. N.-V.,
*Appellant.*

Washington County Circuit Court
J090600;
Petition Number 05J090600;
A147958

342 P3d 1046

Angela Sherbo argued the cause and filed the briefs for appellant.

Jamie Contreras, Assistant Attorney-in-Charge, argued the cause for respondent. On the brief were Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Laura S. Anderson, Senior Assistant Attorney General.

Before Haselton, Chief Judge, and Armstrong, Ortega, Sercombe, Duncan, Nakamoto, Egan, DeVore, Tookey, Garrett, and Flynn, Judges.

SERCOMBE, J.

Egan, J., dissenting.

**SERCOMBE, J.**

Youth appeals a judgment of the juvenile court granting the state's petition to waive youth into circuit court so that he could be tried as an adult on the charge of aggravated murder. Youth, who was 13 years and eight months old at the time of the alleged offense, was made eligible for adult prosecution by ORS 419C.352, which allows for discretionary waiver for 12- to 14-year-olds accused of certain crimes if the juvenile court "makes the findings required under ORS 419C.349(3) and (4)." The juvenile court in this case, after a hearing, found that youth "at the time of the alleged offense was of sufficient sophistication and maturity to appreciate the nature and quality of the conduct involved" under ORS 419C.349(3) and, after reviewing the additional criteria set out in ORS 419C.349(4), found "that retaining jurisdiction [would] not serve the best interests of the youth and of society and therefore [was] not justified."

On appeal, youth's sole contention is that the juvenile court misinterpreted ORS 419C.349(3) and therefore erred in finding that youth satisfied that criterion. He argues that the text, context, and legislative history of ORS 419C.349(3) demonstrate that the legislature intended to require "a showing of more sophistication and maturity than is possessed by the twelve to fourteen year-old, with normally developed intellectual and emotional capacities." As explained in detail below, we conclude that the text, context, and legislative history of ORS 419C.349(3) do not support that view. The legislature intended ORS 419C.349(3) to be a predicate threshold finding of mental capacity before the juvenile court weighs the additional, and more wide-ranging, criteria in ORS 419C.349(4). Specifically, the legislature intended ORS 419C.349(3) to test whether a youth had enough sophistication and maturity to appreciate the "nature and quality" of his actions—*i.e.*, whether he could appreciate what he was doing in a physical sense and that those actions were wrong or would likely have criminal consequences. Because the evidence supports the juvenile court's finding that youth met that standard, we affirm.

## I. STANDARD OF REVIEW

Youth requests that we exercise our discretion to review certain factual findings *de novo*, arguing that this is an "exceptional" case. *See* ORS 19.415(3)(b) (Court of Appeals has discretion to "make one or more factual findings anew upon the record"); ORAP 5.40(8)(c) ("The Court of Appeals will exercise its discretion * * * to make one or more factual findings anew on the record only in exceptional cases."). We decline that request. Youth challenges a particular determination of the juvenile court—that youth, at the time of the offense, was of sufficient sophistication and maturity to appreciate the nature and quality of the conduct involved. But youth's primary contention is a legal one—that the juvenile court made an "erroneous assumption[] about what the statutory term[s] mean[]" by "equating 'average' 13 year-old sophistication and maturity with the higher degree of sophistication and maturity intended by the legislature." Put another way, the success of youth's argument on appeal turns on the proper interpretation of ORS 419C.349(3), not on whether we take a fresh look at the evidence in this case. *Cf. Dept. of Human Services v. A. R. S.*, 256 Or App 653, 656, 303 P3d 963, *rev den*, 354 Or 386 (2013) (declining to exercise *de novo* review because the court could resolve the "appeal based on a purely legal question—one that [was] not dependent on any disputed factual findings of the trial court"). Beyond that, our review of the juvenile court's findings that relate to the disputed legal issue shows that those findings comport with the evidence in the record, and those findings are consistent with the court's decision.

For those reasons, we conclude that this is not a case that warrants *de novo* review of the evidentiary record. Accordingly, we review the record to determine whether any evidence, and the inferences that reasonably can be drawn from the evidence, supports the juvenile court's findings. *State v. S. T. S.*, 236 Or App 646, 655, 238 P3d 53 (2010). We review the juvenile court's legal conclusions, including its interpretation of ORS 419C.349(3), for errors of law. *Id.*

## II. BACKGROUND

In accordance with our standard of review, we set out the procedural and historical facts necessary to give context to our discussion of the parties' dispute about the meaning of ORS 419C.349(3). The state alleged that youth and the older brother of youth's girlfriend, Alejandro Aguilar-Mandujano, beat, stabbed, and robbed the victim on October 2, 2009. The victim died as a result of his injuries. The state charged youth by juvenile court petition with offenses that, if committed by an adult, would constitute the crimes of aggravated murder, first-degree robbery, and unlawful use of a weapon. The state petitioned to waive youth into circuit court for prosecution as an adult on the aggravated murder charge under ORS 419C.349 and ORS 419C.352.

ORS 419C.352 sets forth the conditions for waiver for youths who are 12, 13, or 14 years of age:

"The juvenile court, after a hearing * * * may waive a youth under 15 years of age at the time the act was committed to circuit court for prosecution as an adult if:

"(1) The youth is represented by counsel during the waiver proceedings;

"(2) The juvenile court makes the findings required under ORS 419C.349(3) and (4); and

"(3) The youth is alleged to have committed an act or acts that if committed by an adult would constitute [aggravated murder or other crimes]."

Subsections (3) and (4) of ORS 419C.349 set forth specific criteria by which the court assesses the youth:

"(3) The youth at the time of the alleged offense was of sufficient sophistication and maturity to appreciate the nature and quality of the conduct involved; and

"(4) The juvenile court, after considering the following criteria, determines by a preponderance of the evidence that retaining jurisdiction will not serve the best interests of the youth and of society and therefore is not justified:

"(a) The amenability of the youth to treatment and rehabilitation given the techniques, facilities and personnel for rehabilitation available to the juvenile court and

to the criminal court which would have jurisdiction after transfer;

"(b) The protection required by the community, given the seriousness of the offense alleged;

"(c) The aggressive, violent, premeditated or willful manner in which the offense was alleged to have been committed;

"(d) The previous history of the youth, including:

"(A) Prior treatment efforts and out-of-home placements; and

"(B) The physical, emotional and mental health of the youth;

"(e) The youth's prior record of acts which would be crimes if committed by an adult;

"(f) The gravity of the loss, damage or injury caused or attempted during the offense;

"(g) The prosecutive merit of the case against the youth; and

"(h) The desirability of disposing of all cases in one trial if there were adult co-offenders."

Here, the juvenile court heard evidence that, at the time the victim was killed in early October 2009, youth was 13 years old and Aguilar-Mandujano was 20 years old. Aguilar-Mandujano gave a statement to police, describing how he had planned to rob and murder the victim and explaining that he and youth carried out the plan at a park near the Tualatin River. Youth waived his *Miranda* rights and, after being confronted with Aguilar-Mandujano's statement, admitted that he had participated in the robbery and murder. Youth stated that, on the day of the murder, Aguilar-Mandujano told him that he planned to kill the victim, and youth agreed to "have his back." Youth told police that he drove with Aguilar-Mandujano to the park and, after they arrived, he hit the victim on the head several times with a tire iron while Aguilar-Mandujano stabbed him. After being handed the knife, youth then stabbed the victim. At Aguilar-Mandujano's direction, youth kicked the victim's body into the river.

Three expert witnesses provided testimony related to whether "youth at the time of the alleged offense was of sufficient sophistication and maturity to appreciate the nature and quality of the conduct involved." ORS 419C.349(3). On behalf of the state, Dr. Sebastian interviewed and tested youth on three dates in November 2010. In her report, which the state introduced and relied upon in its waiver petition, Sebastian explained that youth was "bright," he "knew that he would be in legal trouble from his encounter with [the victim]," and he could "articulate that what he did was wrong and understands the consequences." At the same time, Sebastian stated that youth "has not yet developed an internal locus of control, is influenced and led by older youth[s]," and "has a hard time delaying gratification, favoring a more immediate payoff." Ultimately, Sebastian summarized her conclusions regarding youth's sophistication and maturity:

> "By structured interview, testing and collateral data, it is this examiner's opinion that [youth] is as sophisticated and mature as one might expect of a thirteen/fourteen-year old. In other words, he is average in sophistication and maturity for his age.

> "Using records, testing and interview it is clear this young man has the ability to: 1) think independently, 2) understand behavioral norms and expectations of adolescents in the larger picture, 3) weigh the risks and benefits of his actions, 4) demonstrate age appropriate social skills, 5) anticipate the consequences of his actions, 6) discern which of his behaviors are antisocial.

> "When compared to his age mates, he is just as effective or more effective (because of his strong cognitive ability) in understanding that his crime was wrong and identifying alternatives to his actions. He is less able than his peers at understanding his emotions, resolving conflicts effectively and resisting the influence of other youth[s]."

Youth presented the testimony of Dr. Nagel, who did not examine youth, but testified about the science of adolescent brain development. Nagel testified that the brain's prefrontal cortex is late to develop as adolescents age, yet "is most heavily involved in * * * executive functions," which includes "planning, problem solving, higher level attention,

the ability to dual-task, the ability to appreciate long-term consequences; all of those very high level thinking type things." Nagel explained that the "crux" of an adolescent's "vulnerability and immaturity" was that the "connections between the pre-frontal cortex that allow you in a cold situation to say, 'Oh yes, I know right from wrong,' are not mature. *** [T]hey don't kick in fast enough to rein in the emotional or reward based systems of the brain." When asked if a 13-year-old's brain could be developed enough to make reasoned decisions "in heated, emotional situations," she explained that "[t]here has been no evidence to suggest that a 13-year-old anywhere in the world would be the same as a mature adult."

Youth also presented a written evaluation from Dr. Bolstad, who evaluated youth six months after his arrest and then twice thereafter. With respect to youth's sophistication and maturity, Bolstad "did not find consistent evidence to indicate that [youth] is any less mature than most 13 year olds. In some respects, he appears to be more mature; in others, less mature." Bolstad pointed to research showing "that young adolescents are more vulnerable to impulsive decision making and risky behaviors than their older, adult counterparts." "It would be contrary to [that research]," Bolstad stressed, "to assume that [youth] possessed the same rational faculties as an adult in his decision making to participate in this alleged crime." In Bolstad's view, "[o]ne of the central aspects pertaining to the issue of sophistication and maturity *** is the discrepancy in ages between [Aguilar-Mandujano] and [youth]." Bolstad explained that "[y]oung adolescents are vulnerable to turning over their decision making responsibilities to their peers or leaders among their peer group."

Bolstad also testified at the waiver hearing, reiterating his concerns about youth's susceptibility to peer pressure and his poor judgment. On cross-examination, Bolstad agreed that a normal 13-year-old brain can "appreciate the idea of [assaultive] behavior," can "appreciate or understand the property rights of others," and can understand that assaultive behavior is wrong. The prosecutor also asked about youth's appreciation of his actions at the point when

youth drove to the park with Aguilar-Mandujano and the victim:

> "Q. Alright, so again let's just accept that assumption, that he knew they were going to kill [the victim], he was asked to participate. Could he appreciate what he was about to do at that point?
>
> "A. In terms of appreciating that what he was about to do was against the law? Yes. In terms of appreciating that what he was doing was potentially going to harm someone? Yes.
>
> "Q. So, the nature of the crime he could appreciate?
>
> "A. The nature of the crime, yes. I'm not so sure he could appreciate it at a level of having empathy because I think that's a much more challenging task for a 13 year old with an immature brain, but in those other regards I would answer yes."

After considering that evidence, along with numerous exhibits and testimony from several witnesses as to the criteria in ORS 419C.349(4), the court issued written findings in support of its decision to waive youth into circuit court to be tried as an adult. At the outset, the court found that "[t]he evidence supporting Youth's involvement in the alleged offenses is reliable and convincing." The court characterized youth's participation as "purposeful and intimate" and described youth's "reaction" following his participation in the offense as "similarly purposeful," given youth's efforts to hide his involvement and his ability to "maintain confidentiality of his participation in the alleged events until confronted by police."

In accord with the testimony of the expert witnesses, the court found that youth's behavior "demonstrate[d] a degree of maturity consistent with Youth's biological age at the time of the event, and in several respects a degree of maturity consistent with an older youth." Citing testimony from Nagel, the court acknowledged that "adolescents are particularly susceptible to poor judgment in emotional or peer driven situations." But, in the court's view, "[a]lthough Youth's decisions were tragically flawed, his statements to police demonstrate awareness regarding the nature of the criminal act, the degree of his participation in the criminal

act, and an awareness of the consequences of the criminal act if apprehended by authorities." Further, the court found that youth "demonstrated sophisticated behavior and a high degree of maturity in commission of the offenses, through the purposeful and goal oriented conduct before, during and after the event."

Ultimately, the court found, under ORS 419C.349(3), that youth "was of sufficient sophistication and the maturity to appreciate the nature and quality of the conduct of the alleged offense of Aggravated Murder." The court also found that waiver was in the best interest of society and youth after reviewing the criteria in ORS 419C.349(4):

> "Because of the seriousness of the alleged crime, Youth's prior record of assaultive and violent behavior, and the inability of previous community interventions to successfully address Youth's behavioral and emotional health, the amenability of the Youth to rehabilitation and treatment is best served through waiver to the adult court for prosecution."

The court granted the state's petition.[1] As noted, on appeal, youth's sole contention is that the court erred in finding that youth, at the time of the alleged offense, was of sufficient sophistication and maturity to appreciate the nature and quality of the conduct involved.

## III. ANALYSIS

Youth's challenge to the juvenile court's waiver decision, which is focused entirely on the court's finding under ORS 419C.349(3), turns on what the legislature intended that statute to mean. In youth's view, "the statute requires a showing of more sophistication and maturity than is possessed by the twelve to fourteen year-old, with normally developed intellectual and emotional capacities." And, youth argues, the court's assessment of a youth's ability to "appreciate the nature and quality of the conduct"

---

[1] The court considered only the aggravated murder charge in its waiver decision, but the court ultimately ordered that youth be waived to adult court on the charges for robbery and unlawful use of a weapon, as well. *See* ORS 419C.358 (requiring that "[a]ny nonwaivable charges arising out of the same act or transaction as the waivable offense shall be consolidated with the waivable charge for purposes of conducting the adjudicatory hearing on the nonwaivable charges").

is a wide-ranging inquiry, taking into account the youth's ability to "exercise mature judgment" and his "vulnerability to peer pressure." Youth contends that the court erred by "discounting the scientific evidence about young adolescents' (and this young adolescent's, in particular) abilities, to exercise mature judgment, because of the co-occurrence of the onset of puberty" and the ongoing development of the brain. The state counters that a review of the text, context, and legislative history of ORS 419C.349 and ORS 419C.352 reveals no evidence that "the criterion in what is now ORS 419C.349(3) was intended as anything more than a predicate threshold finding of mental capacity the state must satisfy before the juvenile court weighs the additional criteria in ORS 419C.349(4)." According to the state, "the legislature intended that [criterion] to exclude from adult prosecution, those juveniles who did not comprehend, because of mental or emotional defect or marked immaturity, the nature and quality of their criminal conduct."

Our task is to ascertain the meaning of the legislature's intent by examining the statute's text in context, along with relevant legislative history. *State v. Gaines*, 346 Or 160, 171-73, 206 P3d 1042 (2009). We start with the statute's text, which serves as the "best evidence of the legislature's intent." *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610, 859 P2d 1143 (1993). In the absence of evidence to the contrary, we assume that the legislature intended that the wording of an enactment to be given its ordinary meaning. *State v. Murray*, 340 Or 599, 604, 136 P3d 10 (2006). As a "useful starting point" to determine that meaning, we look to the definitions of the terms used in ORS 419C.349(3) found in dictionaries of common usage. *State v. Holloway*, 138 Or App 260, 265, 908 P2d 324 (1995). We are mindful, however, that the meaning of the statute does not "turn only on the dictionary definition of one of its words"; we must examine how each word is used in context. *Elk Creek Management Co. v. Gilbert*, 353 Or 565, 574, 303 P3d 929 (2013). That is especially true where, as here, the parties dispute not just the meaning of a single term, but the meaning of an entire statutory phrase—"sufficient sophistication and maturity to appreciate the nature and quality of the conduct involved."

With those principles in mind, we start with the dictionary definitions of the terms in ORS 419C.349(3). "Sophistication" means "the quality or state of being sophisticated" and "the quality or the character of being intellectually sophisticated (as through cultivation, experience, or disillusionment)." *Webster's Third New Int'l Dictionary* 2174 (unabridged ed 2002). "Sophisticated," in turn, means "**2** : deprived of native or original simplicity: as * * * **b** : WORLDLY-WISE, KNOWING <a ~ adolescent>." *Id.* The dictionary defines "maturity" as "the quality or state of being mature," *id.* at 1395, and "mature" as

> "**2 a** : having attained the normal peak of natural growth and development : fully grown and developed * * * **c** : having or expressing the mental and emotional qualities that are considered normal to an adult socially adjusted human being <a ~ outlook> <parents were willing to be ~, to take responsibility –H.S.Canby>."

*Id.* at 1394. As youth suggests, those definitions of sophistication and maturity—viewed in isolation—describe qualities that are associated with a normal, well-adjusted adult.

But the statute, of course, does not use those terms in isolation. It requires "*sufficient* sophistication and maturity." ORS 419C.349(3) (emphasis added). "Sufficient" means "marked by quantity, scope, power, or quality to meet with the demands, wants, or needs of a situation or of a proposed use or end." *Webster's* at 2284. That term, as its definition suggests, is largely dependent on the words it modifies. Here, where we are concerned with "sufficient sophistication and maturity," we ask whether the youth has some amount of those qualities to meet the demands of a "particular situation" or "proposed * * * end." And the "particular situation" we are concerned with is the youth's ability "to appreciate the nature and quality of the conduct involved."

"Appreciate" means "**1 a** * * * (2) : to judge or evaluate the worth, merit, quality, or significance of : comprehend with knowledge, judgment, and discrimination <incapable of appreciating the difference between right and wrong –B.N.Cardozo>." *Id.* at 105. As the dictionary's verbal

illustration[2] from Justice Cardozo suggests, however, the word "appreciate" has a recognized use in the law related to criminal capacity. Indeed, youth acknowledges that the legislature incorporated an "element of capacity" into the juvenile court's evaluation of the youth's sophistication and maturity. And youth specifically asserts that "appreciate," as used in ORS 419C.349(3), has the same meaning as "appreciate" in Oregon's statute describing the insanity defense, ORS 161.295(1):

> "A person is guilty except for insanity if, as a result of mental disease or defect at the time of engaging in criminal conduct, the person lacks substantial capacity either to appreciate the criminality of the conduct or to conform the conduct to the requirements of the law."

As used in that statute, the term "appreciate" has a meaning that encompasses an "emotional as well as intellectual cognition of the act." *State v. Dyer*, 16 Or App 247, 258, 518 P2d 184 (1974) (comparing the *M'Naghten* rule's use of the term "know" in defining the insanity defense, the Oregon Supreme Court's use of the term "understand" in its formulation of the *M'Naghten* rule, and the use of the term "appreciate" in ORS 161.295, and explaining that the term appreciate, like the term understand, "allow[s] a full range of testimony as to emotional as well as intellectual cognition of the act"). We agree with youth that the formulation of criminal capacity described in the insanity statute, enacted in 1971, is helpful context in construing the meaning of the sophistication and maturity criterion, enacted in 1985 as *former* ORS 419.533(1)(c) (1985), *renumbered as* ORS 419C.349(3) (1993). *See, e.g., Gaston v. Parsons*, 318 Or 247, 253, 864 P2d 1319 (1994) ("[W]ords in a statute that have a well-defined legal meaning are to be given that meaning in construing the statute."); *State v. Carr*, 319 Or 408, 411-12, 877 P2d 1192 (1994) ("Context includes other related statutes.").

We look, finally, to the definitions of "nature" and "quality." The definition of "nature" most applicable here

---

[2] The "verbal illustrations" in *Webster's* provide "appropriate uses of [a defined term] in context." *Dewsnup v. Farmers Ins. Co.*, 349 Or 33, 40, 239 P3d 493 (2010).

is "the essential character or constitution of something." *Webster's* at 1507. "Quality" is similarly defined as "a peculiar and essential character : NATURE, KIND \* \* \* <the offender knew the nature and ~ of the act –B.N.Cardozo>." *Id.* at 1858. Those definitions provide limited guidance— they overlap, both referencing the "essential character" of something, and it is unclear whether the legislature, when describing the ability to appreciate the "essential character" of conduct, intended to include a youth's ability to understand the wrongful or criminal character of that conduct.

As with the term "appreciate," however, the phrase "nature and quality of the act" (or "of conduct") has a well-worn legal meaning in the context of criminal capacity. Indeed, the common-law test "for determining legal responsibility" in Oregon, used at least since 1884, specifically referenced a defendant's capacity to know or understand "the nature and quality of the act":

> "Ever since 1884, when the case of *State v. Murray*, [11 Or 413, 5 P 55], was decided, to and including *State v. Wallace*, [170 Or 60, 131 P2d 222], decided in 1942, the test for determining legal responsibility in Oregon has been announced substantially as follows: If at the time of committing an act, the party was laboring under such a defect of reason from disease of the mind as not to know *the nature and quality of the act he was doing*, or if he did know the nature and quality thereof that he did not know that he was doing what was wrong, he should not be held responsible under the criminal law."

*State v. Layton*, 174 Or 217, 226, 148 P2d 522 (1944) (brackets in original; emphasis added); *see also Dyer*, 16 Or App at 258 (explaining that the Oregon Supreme Court later "liberalized its version of the *M'Naghten* rule" by substituting "understand" for "know"). The legislature drew from that common-law test for criminal capacity when, in 1971, it enacted ORS 161.295(1), the insanity defense statute, which allows a person to be found "guilty except for insanity" if "the person lacks substantial capacity either to appreciate the criminality of the conduct or to conform the conduct to the requirements of the law." Although that statute does not

explicitly reference the "nature and quality" of an act or conduct,[3] the first element of that statute—a lack of substantial capacity to appreciate the criminality of one's conduct, ORS 161.295(1)—is, "in different words," the "former test" in Oregon for criminal responsibility—the ability to appreciate the "nature and quality" of conduct and to distinguish between right from wrong. *See Dyer*, 16 Or App at 257-59 (relying on statements in the Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report § 36, 36-37 (July 1970)). Given the longstanding use of the phrase "nature and quality" of conduct in the common-law test for criminal capacity—and the legislature's incorporation of that phrase into more modern descriptions of capacity, like that found in the insanity defense statute—we look to the acquired meaning of that phrase in those sources in determining the meaning of that phrase in ORS 419C.349(3).

The question, then, is what precisely it means to appreciate "the nature and quality" of one's actions. In the context of the insanity defense, at least, the Supreme Court has described that concept simply, as an understanding of what one is doing. *See State v. Trapp*, 56 Or 588, 591, 109 P 1094 (1910) (describing insanity as a person's inability "to know what he was doing" and "to distinguish between right and wrong"). More specifically, Professor LaFave explains that, as used in the description of the insanity defense in *M'Naghten's Case*, 8 Eng Rep 718 (1843), from which Oregon's formulation evolved, "the entire phrase has been typically held to mean that the defendant must have understood the physical nature and consequences of the act. Thus, an accused must have known that holding a flame to a building would cause it to burn, or that holding a person's head

---

[3] With respect to that phrase, youth again references the insanity defense statute, but this time only to draw a distinction from the waiver statute. He argues that, as between the two statutes, "that which the actor needs to 'appreciate' is entirely different." That is, in youth's view, appreciating "the criminality" of conduct is very different from appreciating the "nature and quality" of conduct. Youth does not, however, explain what it means to "appreciate the nature and quality of the conduct involved," apart from arguing that it does *not* mean "an intellectual appreciation, after the fact, that the conduct was unlawful."

under water would cause him to die." Wayne R. LaFave, 1 *Substantive Criminal Law* § 7.2(b)(3) (2d ed 2003).[4]

Unlike *M'Naghten* and other criminal capacity tests using the phrase "nature and quality of the act," ORS 419C.349(3) speaks to an appreciation of "the nature and quality of the conduct" without a corresponding reference to an appreciation for the wrongfulness of that conduct. And given the breadth of the other words used in ORS 419C.349(3), the phrase "nature and quality of the conduct" has a slightly broader meaning than an appreciation of the physical nature of the act. The word "appreciate" is a broad term reflecting an "emotional as well as intellectual cognition of the act," *Dyer*, 16 Or App at 258, which signifies that the legislature had more in mind than just an appreciation of the physical nature and physical consequences of the act. *See, e.g.*, LaFave, 1 *Substantive Criminal Law* § 7.2(b)(3) ("'To know the quality of an act, with all its social and emotional implications, requires more than an abstract, purely intellectual knowledge. Likewise, to talk of appreciating the full significance of an act means that "nature and quality" must be understood as including more than the physical nature of the act.'" (quoting A. Goldstein, *The Insanity Defense* 51 (1967))). Further, ORS 419C.349(3) does not simply require a finding that the youth "appreciate[d] the nature and quality of the conduct involved"; the court must make that determination in connection with the youth's "sophistication and maturity." By connecting the capacity determination with those qualities—specifically

---

[4] *Wharton's Criminal Law* provides a similar description of what it means to appreciate the "nature and quality" of one's actions, at least in contrast to appreciating the wrongfulness of those actions:

"The *M'Naghten* test consists of two elements which logically can be separated. The first portion relates to an accused who is psychotic to an extreme degree. It assumes an accused who, because of mental disease, *did not know the nature and quality of his act; he simply did not know what he was doing.* For example, in crushing the skull of a human being with an iron bar, he believed that he was smashing a glass jar. The latter portion of *M'Naghten* relates to an accused who knew the nature and quality of his act. He knew what he was doing; he knew that he was crushing the skull of a human being with an iron bar. However, because of mental disease, he did not know that what he was doing was wrong. He believed, for example, that he was carrying out a command from God."

Charles E. Torcia, 2 *Wharton's Criminal Law* § 101 (15th ed 1994) (emphasis added).

"sophistication," *i.e.*, a worldly-wise character, *Webster's* at 2174—ORS 419C.349(3) suggests an appreciation of one's acts and their consequences that is broad enough to include appreciation that the actions are wrongful or will have criminal consequences. We therefore conclude that the phrase "appreciate the nature and quality of the conduct," as used in ORS 419C.349(3), describes an appreciation of the physical nature and consequences of one's conduct, along with the wrongful or criminal quality of that conduct.[5]

The text of ORS 419C.349(3) is not so broad, however, to require that a youth have the ability to conform the youth's conduct to the requirements of the law. The legislature has distinguished that ability from an ability to appreciate the criminality of conduct. *See* ORS 161.295(1) (insanity involves mental disease or defect that impairs "substantial capacity *either* to appreciate the criminality of the conduct *or* to conform the conduct to the requirements of the law" (emphasis added)). Since the enactment of the sophistication and maturity criterion in 1985, the legislature has similarly distinguished between conforming one's conduct to the law and "appreciat[ing] the nature and quality" of an act, when, in 2005, it amended ORS 419C.411(2) to describe the insanity defense available to youths in juvenile proceedings:

"The court shall find a youth responsible except for insanity if:

"(a) The youth asserted mental disease or defect as a defense * * *; and

"(b) The court determined by a preponderance of the evidence that, as a result of mental disease or defect at the time the youth committed the act alleged in the petition, the youth lacked substantial capacity either *to appreciate the nature and quality of the act or to conform the youth's conduct to the requirements of law.*"

---

[5] To the extent that we have any doubt of the breadth of that phrase, the legislative history of *former* ORS 419.533(1)(c), which we review below, confirms our view of the statute based on its text in context. We note that the state, in its brief and at oral argument, did not advance an argument that the statute describes only the ability to appreciate the physical nature and physical consequences of one's actions. Rather, the state suggests that ORS 419C.349(3) was met because youth had the ability to understand that his actions would make him "responsible for the death of [the victim], in violation of the law."

(Emphasis added.)[6] *See Halperin v. Pitts*, 352 Or 482, 490, 287 P3d 1069 (2012) (stating that later-enacted, related statutes may be helpful "for the purpose of demonstrating consistency (or inconsistency) in word usage as indirect evidence of what the enacting legislature most likely intended").

As our review thus far shows, the text of ORS 419C.349(3) in context is plainly inconsistent with youth's reading of the statute. Youth's primary argument—that the legislature meant above-average sophistication and maturity—relies entirely on the definitions of sophistication and maturity, which, in youth's view, "involve behavior, intellect and emotions beyond those of an average thirteen-year-old." However, as we have explained, ORS 419C.349(3) is satisfied if the youth possesses sufficient sophistication and maturity—enough of that quality—*to appreciate the nature and quality of the conduct involved.* The level of maturity and sophistication that is "sufficient" is not determined by comparing the youth to others; it is determined by the youth's capacity to appreciate the essential character of his conduct.

Likewise, youth's related contention—that the court, in making that finding, should evaluate the youth's sophistication and maturity in a more holistic sense, taking into account his "vulnerability to peer pressure" and inability to "resist[] the influence of other youth[s]," among other things—cannot be squared with the text of ORS 419C.349(3). Although the ability "to appreciate the nature and quality of the conduct involved" is broad enough to include an appreciation of the criminality or wrongfulness of one's actions, that phrase's text is not so broad that it encompasses an ability to make responsible decisions, resist peer pressure, and control impulses. Those considerations may relate to a youth's ability to conform his conduct to the law, but the legislature did not speak so broadly in creating a threshold capacity determination for waiver in ORS 419C.349(3).

Our discussion thus far also highlights our disagreement with the dissent's very broad formulation of the

---

[6] We express no opinion on the specific meaning of the phrase "nature and quality of the act" as used in ORS 419C.411(2).

ability "to appreciate the nature and quality of the conduct involved," which includes an understanding of "the effect on the victim and other consequences of the conduct"; "the youth's empathetic capacity"; the "youth's judgment-making ability"; and "the youth's capacity to think independently in light of outside influences." 268 Or App at 552-53 (Egan, J., dissenting). That broad formulation of ORS 419C.349(3) is untethered from the dictionary definitions on which it is based.

For example, working from the term "appreciate"—defined as the ability "to judge or evaluate the worth, merit, quality, or significance of" and to "comprehend with knowledge, judgment, and discrimination," *Webster's* at 105—the dissent concludes that a youth must "be able to make judgments" about the consequences of the conduct. 268 Or App at 551 (Egan, J., dissenting). But that definition is stretched beyond the ability to evaluate to include the ability to resist peer pressure and control impulses; the dissent later explains that a youth's "judgment-making ability" necessarily includes a consideration of "the youth's capacity to think independently in light of outside influences." *Id.* at 552 (Egan, J., dissenting). Likewise, from the definitions of "nature" and "quality"—the "essential character" of something, *Webster's* at 1507, 1858—the dissent interprets "essential character" to include not just the wrongfulness of the act, but "the effect on the victim," along with unspecified "other consequences." *Id.* (Egan, J., dissenting). Given the qualitative nature of all the terms used in ORS 419C.349(3) and the Rorschach-like nature of definitions like "essential character," we think the better approach—and the one dictated by the longstanding use of the terms in ORS 419C.349(3) with respect to criminal capacity—is to rely on the terms' more limited meaning in the context of descriptions of criminal capacity.

Yet the dissent rejects any reference to common-law or statutory formulations for criminal incapacity as context for understanding ORS 419C.349(3).[7] The dissent

---

[7] We note that the dissent relies on the legal definition of the term "appreciate," as it is used in the insanity defense statute, but rejects any reference to the legal meaning of the phrase "nature and quality."

rejects those sources as that context for three reasons: (1) the current description of the insanity defense in ORS 161.295(1) does not use the phrase "nature and quality" of the conduct; (2) the general purpose of the criminal code (punishment)—where the insanity defense statute is found—is different from the general purpose of the juvenile code (rehabilitation)—where the waiver statute is found; and (3) "the adult insanity defense addresses *impaired* adult minds, while the waiver statute deals with *undeveloped* juvenile minds." 268 Or App at 543 (Egan, J., dissenting) (emphasis in original). None of those arguments convinces us that we should disregard the more narrow use of "nature and quality," as is often used in the context of criminal capacity, in favor of the expansive formulation that the dissent adopts.

First, although the dissent focuses on the absence of the phrase "nature and quality" of conduct in the insanity defense statute, as noted earlier, that phrase has been used to describe criminal capacity at common law in Oregon (and across the country) since the nineteenth century. It is that developed legal meaning—one that the legislature took notice of and incorporated into the insanity defense statute, ORS 161.295(1)—that is important context for ORS 419C.349(3).

Second, the fact that those common-law tests for criminal responsibility have been incorporated into *the criminal code*, as with Oregon's insanity defense statute, does not mean that they should be treated as irrelevant because the criminal code has a different purpose than the juvenile code. After all, the waiver statute serves as a bridge between the juvenile system and the criminal system, carving out an exception (adult prosecution) for youths who are ordinarily under the jurisdiction of the juvenile system. Like the insanity defense statute in the criminal code, the waiver statute is intended to determine whether a person should be subject to criminal prosecution. And, in any event, the insanity defense found in the criminal code is markedly similar to ORS 419C.411(2), the insanity provision found *in the juvenile code* (which specifically references "the nature and quality of the act").

Third, although the dissent is correct that "the adult insanity defense addresses *impaired* adult minds, while the waiver statute deals with *undeveloped* juvenile minds," 268 Or App at 543 (Egan, J., dissenting) (emphasis in original), it does not follow that the test for incapacity due to insanity sheds no light on the test for incapacity that the legislature adopted in ORS 419C.349(3). Indeed, the judicial and legislative tests for criminal incapacity due to insanity resemble formulations used to describe incapacity due to age. *See* LaFave, 2 *Substantive Criminal Law* § 9.6(a) (noting that "[v]arious phrases have been used to describe what is required" to rebut the presumption of incapacity due to age—including "guilty knowledge of wrongdoing, a mischievous inclination, an intelligent design and malice in the execution of the act, a consciousness of the wrongfulness of the act, and knowledge of good from evil"—and explaining that "the most modern definition of the test is simply that the surrounding circumstances must demonstrate * * * that the individual knew what he was doing and that it was wrong" (internal quotation marks omitted; omission in LaFave)).[8] Although one test is concerned with lack of capacity due to mental defect while the other is concerned with lack of capacity caused by naturally occurring developmental delay, both tests use mental capacity to determine when it is appropriate for a person to be tried in criminal court.

We turn to youth's separate contextual argument that the structure of the waiver statutes and changes to those statutes over time—specifically amendments made in 1995—support his view of ORS 419C.349(3). To better understand that argument, we briefly review the development of ORS 419C.349 and ORS 419C.352.

---

[8] At common law, a youth between seven and 14 was presumed incapable of forming intent and thus ineligible for criminal prosecution, but the state could rebut that presumption. *State ex rel Juv. Dept. v. Fitch*, 192 Or App 56, 60-61, 84 P3d 190, *rev den*, 337 Or 282 (2004) (explaining that juveniles above the age of seven remained fully subject to criminal prosecution as adults, at the discretion of the local district attorney, until, in 1959, the juvenile court was given exclusive jurisdiction over those under age 18, subject to provisions authorizing waiver into adult court); *see also State ex rel Juv. Dept. v. Reynolds*, 317 Or 560, 566, 857 P2d 842 (1993) ("Oregon's Deady Code contained no statutes regarding juvenile offenders or the age of criminal responsibility, so it is likely that Oregon applied the common law rule [setting the age of incapacity at seven].").

Those statutes were originally part of *former* ORS 419.533, which allowed for discretionary waiver (then called "remand") of 15-, 16-, and 17-year-olds. Or Laws 1985, ch 631, § 1. *Former* ORS 419.533(1)(c) and (d) set out the waiver criteria as they now exist, apart from minor changes in terminology. *Former* ORS 419.533(3) operated as a limitation on subsection (1) by specifying that 15-year-olds must be represented by counsel and could only be waived for one of six crimes, whereas 16- and 17-year-olds were subject to waiver for various felonies. In 1993, as part of a renumbering, *former* ORS 419.533(1) became ORS 419C.349 and *former* ORS 419.533(3) became ORS 419C.352. Or Laws 1993, ch 33, §§ 213-14.

In 1995, without making any changes to the waiver criteria in ORS 419C.349(3) and (4), the legislature made several changes to which youths would be subject to those criteria. First, as a reflection of the voters' intent in approving Ballot Measure 11 (1994), the legislature made 15- to 17-year-olds automatically subject to prosecution as adults for Measure 11 crimes (and for aggravated murder). Or Laws 1995, ch 422, § 49.[9] Second, by amending ORS 419C.352 and lowering the minimum age of criminal responsibility to 12, the legislature made ORS 419C.352 applicable to 12- to 14-year-olds who committed murder or any aggravated form thereof, first-degree rape, first-degree sodomy, and first-degree unlawful sexual penetration. Or Laws 1995, ch 422, § 78 (amending ORS 419C.352 to allow for waiver of a "youth under 15 years of age" if, *inter alia*, the "[t]he juvenile court makes the findings required under ORS 419C.349(3) and (4)"); Or Laws 1995, ch 422, § 58 (amending ORS 161.290 to lower the minimum age of criminal responsibility to 12). As noted, ORS 419C.349 was unchanged, and that statute continued to make 15- to 17-year-olds who committed certain non-Measure 11 felonies subject to discretionary waiver.

---

[9] As adopted by the voters in 1994, Measure 11 set mandatory minimum sentences for various crimes and provided, "Notwithstanding any other provision of law, when a person charged with any of the offenses listed in [Measure 11] is 15, 16 or 17-years of age, at the time the charges are filed, that person shall be tried as an adult." That provision, which was part of the focus of the legislature's changes to the waiver statutes in 1995, "demonstrated the intent of the voters to eliminate juvenile court jurisdiction over 15, 16, and 17 year olds charged with a Measure 11 offense." *State v. Godines*, 236 Or App 404, 418, 236 P3d 824 (2010).

Youth's argument based on those 1995 amendments proceeds as follows. First, youth argues that the legislature's placement of 15- to 17-year-olds charged with aggravated murder and Measure 11 crimes in adult court reflects a legislative presumption that those youths are "sophisticated and mature enough to stand trial as adults." Second, by making that presumption, the legislature intended to set the benchmark for sophistication and maturity that a youth subject to discretionary waiver should be compared against. As a result, a 12- to 14-year-old must have sophistication and maturity similar to a 15- to 17-year-old to satisfy ORS 419C.349(3); "average" sophistication and maturity for one's age group is not enough.

We are not persuaded by that structural reading of the waiver statutes. Youth's proposed interpretation of ORS 419C.349(3)—based entirely on changes, made in 1995, to other waiver statutes—is at odds with the text of ORS 419C.349(3), which has remained substantially unchanged since its enactment in 1985 as *former* ORS 419.533(1)(c). We recognize that "[l]ater amendments that materially change the text *or context* of an earlier statute can change the meaning of the earlier statute when the changed meaning is either 'expressly declared or necessarily implied.'" *Dept. of Human Services v. S. M.*, 355 Or 241, 250, 323 P3d 947 (2014) (emphasis added) (quoting *State v. Ofodrinwa*, 353 Or 507, 529-30, 300 P3d 154 (2013)). But here, nothing about the contextual changes that youth identifies—changes to *who* ORS 419C.349(3) and (4) apply to—necessarily implies a change to the meaning of ORS 419C.349(3). In other words, the legislature's decision to make certain older youths charged with Measure 11 crimes subject to adult court prosecution did not implicitly reset the "sophistication and maturity" standard by which younger youths should be judged.[10]

---

[10] We note that, were we to accept youth's argument that the legislature meant for the juvenile court to compare youths automatically subject to prosecution as an adult—15- to 17-year-olds charged with Measure 11 crimes—with youths subject to discretionary waiver, then that must be the standard by which to compare *all* youths subject to discretionary waiver: 12- to 14-year-olds charged with certain crimes *and 15- to 17-year-olds charged with non-Measure 11 crimes*. Under youth's proposed interpretation, then, the juvenile court would be tasked with determining whether a 15- to 17-year-old charged with a non-Measure 11 crime had the level of sophistication and maturity of a 15- to 17-year-old charged with a Measure 11 crime.

In sum, the text and context of ORS 419C.349(3) reflect the legislature's recognition that some youths, because of lack of maturity and sophistication, will not have the mental and emotional facility to understand their actions in a physical sense and that those actions are wrong and will likely have criminal consequences. For those youths, ORS 419C.349(3) serves as a bar to waiver into adult court. And for youths who meet that criterion, the juvenile court may then proceed to ORS 419C.349(4) to determine if retaining jurisdiction is in the best interest of the youth and society. The wide-ranging criteria in subsection (4) allow for a more thorough-going evaluation of the youth's circumstances—including the "the previous history of the youth" and the youth's "physical, emotional and mental health"—as well as the manner in which the offense was alleged to have been committed.[11] Although those criteria may account for some considerations related to those that youth highlights—*e.g.*, the degree to which a 20-year-old influenced youth's involvement in the crime—the text and context of ORS 419C.349(3) show that that provision functions as a more narrow, focused, and preliminary inquiry.

The legislative history confirms our understanding of ORS 419C.349(3). Specifically, the legislative history shows that the legislature, when it adopted the sophistication and maturity criterion in 1985, viewed it as requiring a specific, threshold finding of mental capacity before the court engaged in a more holistic evaluation of the youth's circumstances. The history of the amendments to related statutes in 1995 does not show that the legislature intended to alter that criterion.

The sophistication and maturity criterion was first included in the discretionary waiver criteria in 1985 along with several amendments to *former* ORS 419.533. Those amendments began in 1983 with House Bill (HB) 2955 as

---

[11] The dissent is therefore wrong to suggest that our interpretation of ORS 419C.349(3) "will ensure that all but the most developmentally challenged youths will be capable of being waived into the adult criminal system, as long as the youth's conduct constituted one of the enumerated crimes if charged as an adult." 268 Or App at 555 (Egan, J., dissenting). As noted, the juvenile court's finding under subsection (3) gives way to an extensive individualized analysis under subsection (4); it does not mean that youth are automatically waived to adult court.

part of an effort, led by Senator Nancy Ryles, to reform the waiver process (then called "remand"). Senator Ryles explained that one of the "major components" of the bill was to lower the age of remand from 16 to 14 "in the case of violent crimes only." Testimony, House Committee on Judiciary, Subcommittee 1, HB 2955, May 18, 1983, Ex A (statement of Sen Nancy Ryles) (underscoring omitted). According to Senator Ryles, the legislature had made "exceptions" to the "general philosophy that juveniles may be lacking in understanding or information and therefore may not be fully responsible for the crime they have committed" by allowing 16- and 17-year-olds to be tried as adults, but the legislature had "not yet come to terms with those exceptional cases where a younger teenager commits a violent crime." *Id.* Senator Ryles viewed the existing remand framework as inadequate:

> "It is not realistic to say that a 14 or 15-year-old is not sufficiently mature to understand the gravity of a violent crime, while a 16-year-old is. We cannot persist in totally defining juveniles by an arbitrary age limit, ignoring the fact that maturation is a gradual process and that some 14 and 15-year-olds may well understand the serious nature of the violent crime they have committed."

*Id.*

Senator Ryles further explained that HB 2955 created a framework for a discretionary remand procedure for all youths subject to remand—those 14 to 17—by setting out criteria that "must be weighed whenever the remand of any juvenile is being considered." *Id.* (underscoring omitted).[12] Those criteria became the focus of representatives from the American Civil Liberties Union of Oregon (ACLU) and the Juvenile Rights Project (JRP). Along with substantial

---

[12] The criteria in the bill, including the sophistication and maturity criterion, were drawn from the United States Supreme Court's decision in *Kent v. United States*, 383 US 541, 86 S Ct 1045, 16 L Ed 84 (1966), which construed the District of Columbia's waiver statute, and, in doing so, set out the D.C. waiver criteria in an appendix to its opinion. However, unlike the sophistication and maturity criterion appended to the *Kent* decision—"[t]he sophistication and maturity of the child as determined by consideration of [the child's] home, environmental situation, emotional attitude and pattern of living," *id.* at 567—HB 2955 connected the youth's level of "sufficient sophistication and maturity" with the youth's ability "to appreciate the nature and quality of the conduct involved."

amendments to several other criteria,[13] the ACLU proposed an amendment to remove the bill's criterion of "sufficient sophistication and maturity to appreciate the nature and quality of the conduct involved" from its present position. The ACLU proposed that it be replaced with a criterion identical to the wording in *Kent v. United States*, 383 US 541, 86 S Ct 1045, 16 L Ed 84 (1966)—"[t]he sophistication and maturity of the child as determined by consideration of the child's home, environmental situation, emotional attitude and pattern of living"—and moved into the list of "best interests" criteria. Exhibit E, House Committee on Judiciary, Subcommittee 1, HB 2955, May 18, 1983.

Eventually, Senator Ryles reached a compromise with the ACLU and JRP regarding the criteria, including the "sufficient sophistication and maturity" criterion appearing in the original bill:

> "The only other question was in the original bill we had set the first one up—'the child at the time of the alleged offense was of sufficient sophistication [and] maturity to appreciate the nature and quality of the conduct involved.' We had set that outside the criteria because we felt that was just the first step one had to do. *If you had a child that didn't know what they had done and couldn't understand what they had done, one really didn't even need to move to any other criteria.* Right away that child should not be remanded. But if * * * the subcommittee did X that out and decided they wanted to list that under the criteria, that's fine with me. That's really just a writing style.

> "But I still think it should be the number one criteria and the number one thing that we have in there because *in case there is a case of a mentally retarded child or someone that is extremely emotionally disturbed or something like that, * * * that's the criteria the court first looks at* and then you begin to measure all these other things to see if remand is the appropriate policy."

Tape Recording, House Committee on Judiciary, HB 2955, June 6, 1983, Tape 408, Side A (statement of Sen Nancy

---

[13] Although our review of the legislative history focuses on the sophistication and maturity criterion, that history reveals extensive discussions of the several other criteria that relate to the juvenile court's evaluation of the best interests of the youth and of society.

Ryles) (emphasis added). Senator Ryles further noted that the "sufficient sophistication" criterion set forth in the original bill was "similar to" the amendment proposed by the ACLU, but explained that she viewed its placement in the original bill as "a much stronger protection for juveniles in this position rather than being listed with the criteria." Exhibit P, House Committee on Judiciary, HB 2955, June 6, 1983. The original version, Senator Ryles reiterated, "would have the effect of eliminating any consideration of remand if, for example, the juvenile was retarded, too immature to understand the nature of the act, etc." *Id.* (underscoring omitted).

The committee ultimately voted to adopt the wording and placement of the "sufficient sophistication and maturity" criterion, as originally proposed by Senator Ryles. Just before that vote, Senator Ryles again explained that that criterion would ensure "that you are dealing with a person that the judge can determine is responsible for what they did and they know what they did." Tape Recording, House Committee on Judiciary, HB 2955, June 6, 1983, Tape 408, Side A (statement of Sen Nancy Ryles).[14] The bill, as amended, was approved in the House but remained in the Senate without a hearing when the 1983 legislature adjourned.

A bill identical to the final version of HB 2955, Senate Bill (SB) 414, was introduced in 1985, with Senator Ryles again shepherding the bill through the legislature. Although there were no changes to the "sufficient sophistication and maturity" criterion (and few changes to the other criteria), Senator Ryles again explained that criterion to a subcommittee of the House Committee on Judiciary:

"[T]he main thing I think you really want to look at is on page 1 of the bill, the judge has [to] look very carefully to say that a person charged with [a] crime was of sufficient

---

[14] No representative for the ACLU appeared at the June 6, 1983, House Committee on Judiciary hearing, and the record does not disclose why the ACLU preferred the wording it proposed, which did not link sophistication and maturity with the capacity to "appreciate the nature and quality of the conduct involved." *See* Exhibit P, House Committee on Judiciary, HB 2955, June 6, 1983 (noting that "ACLU is opposed because 1) they feel all criteria should be listed together; and 2) they wish to retain wording they submitted earlier" (underscoring omitted)).

sophistication and maturity to appreciate the nature and quality of the conduct involved. *So you're really saying yes, the person knew what they did, they knew the consequences of what they did and they were of sufficient maturity to understand that at the time."*

Tape Recording, House Committee on Judiciary, Subcommittee 1, SB 414, May 30, 1985, Tape 692 (statement of Sen Nancy Ryles) (emphasis added).

The ACLU and JRP generally voiced support for some parts of the bill, including the criteria that had been extensively discussed in 1983, and they did not propose any changes to the "sufficient sophistication and maturity" criterion. Those groups did, however, oppose making 14- and 15-year-olds subject to adult prosecution. Tape Recording, Senate Committee on Judiciary, SB 414, May 7, 1985, Tape 123, Side A (statement of Claudia Burton for ACLU; statement of Margaret Nightingale, Staff Attorney for JRP). They argued that the test of criminal responsibility for youths should "involve[] both a capacity to distinguish right from wrong and an ability to conform one's actions to that understanding" because youths "are impulsive (and may have great difficulty controlling [their] impulses), they may have poor judgment, and they are likely to be influenced by their peers." Testimony, House Committee on Judiciary, Subcommittee 1, SB 414, May 30, 1985, Ex D (statement of Claudia Burton).[15]

---

[15] In support of its position, the ACLU quoted scholarship advocating that any inquiry into a youth's criminal capacity should take into account the youth's ability to understand the nature and consequences of his or her actions and distinguish right from wrong, but also the youth's ability to conform his or her conduct to the law:

"Various tests have been used in defining what is required for the state to prove capacity. Most center on the child's capacity to understand the nature and consequences of his acts and to distinguish right from wrong in reference to the charged offense. While this test appears to be sufficient, it may be appropriate to address a second concern in the infancy inquiry: is the child mature enough to conform his behavior to the requirement of the law? A child's moral development is a compendium of substantive knowledge of right and wrong learned in the context of controlling impulse. Lack of impulse control is a real aspect of childhood. Punishment in the absence of such control is as violative of the culpability principle as is punishment where the offender cannot distinguish right from wrong. Courts committed to fully exploring the capacity issue should address the impulse control question."

Andrew Walkover, *The Infancy Defense in the New Juvenile Court,* 31 UCLA L Rev 503, 559-60 (1984); *see* Testimony, House Committee on Judiciary, Subcommittee 1, SB 414, May 30, 1985, Ex D (statement of Claudia Burton).

In response to some of those concerns, Senator Ryles reiterated that

> "the reason for lowering the age of remand and giving the judge the discretion is the relationship to chronological age *** isn't a very good measurement, and the other *** reason for doing it is so therefore even though they'll serve their sentence in time in a juvenile facility they will not be subject to release at age 21 and they will not be subject to having their record expunged."

Tape Recording, Senate Committee on Judiciary, SB 414, May 7, 1985, Tape 124, Side A (statement of Sen Nancy Ryles). Ultimately, the subcommittee agreed to amend the bill to eliminate the remand option for 14-year-olds, but kept the remand option for 15-year-olds. Tape Recording, House Committee on Judiciary, Subcommittee 1, SB 414, June 10, 1985, Tape 737.

Our review of the legislative history leading to the adoption of the sophistication and maturity criterion confirms our understanding of that provision, as informed by the text in context, and contradicts the competing view that the dissent and youth propose. That criterion was described by the legislation's chief sponsor as testing the ability of youths to "know what they ha[d] done," "understand what they had done," and to understand "the consequences of what they [had done]."[16] In describing those youths who would not meet that criterion, Senator Ryles did not give examples of exceptionally mature youths, but those who generally would be thought of as being less mature or sophisticated than their peers, like those youths who are "mentally retarded," "extremely emotionally disturbed," or "too immature to understand the nature of the act."[17]

Those specific, repeated descriptions of the sophistication and maturity criterion cannot be overcome by the single contrary statement by a nonlegislator witness that

[16] *See* Tape Recording, House Committee on Judiciary, HB 2955, June 6, 1983, Tape 408, Side A (statement of Sen Nancy Ryles); Tape Recording, House Committee on Judiciary, Subcommittee 1, SB 414, May 30, 1985, Tape 692 (statement of Sen Nancy Ryles).

[17] Tape Recording, House Committee on Judiciary, HB 2955, June 6, 1983, Tape 408, Side A (statement of Sen Nancy Ryles); Exhibit P, House Committee on Judiciary, HB 2955, June 6, 1983 (underscoring omitted).

youth relies upon. *See* Testimony, House Committee on Judiciary, Subcommittee 1, SB 414, May 30, 1985, Ex F (statement of Keith Meisenheimer, Multnomah County District Attorney's Office) (stating that remand would be appropriate for youths with "advanced maturity, sociopathic character, past record of failure in juvenile court programs, established history of criminal conduct, large size, independence of parental or other adult authority or influence, etc."). Indeed, the same witness, when speaking directly to the remand criteria, explained that the criteria were meant to prevent remand for "those who technically would commit one of these crimes, but do so under circumstances that suggest impulsivity, immaturity." Tape Recording, House Committee on Judiciary, Subcommittee 1, SB 414, May 30, 1985, Tape 694 (statement of Keith Meisenheimer). In any event, we give more weight to the specific statements of the bill sponsor—directed specifically at the sophistication and maturity criterion—as opposed to statements that serve as a general gloss on the entire bill. *See State v. Kelly*, 229 Or App 461, 467, 211 P3d 932, *rev den*, 347 Or 446 (2009) ("[T]he more clearly the history speaks to the meaning of the disputed terms in issue, the more weight the history will be accorded.").[18]

---

[18] Parsing the legislative record reveals additional examples of nonspecific statements that could be stretched to aid youth's argument in a general way. *See* Testimony, Senate Committee on Judiciary, SB 414, Apr 25, 1985, Ex B (statement of Sen Nancy Ryles) ("The major intent of the legislation is to provide the remand option for those *more mature 14 and 15 year-olds* so that those who commit a violent crime will not be prematurely released back into society at age 21—without regard to the type of offense or degree of rehabilitation." (Emphasis added.)). But those statements, too, are contradicted by other statements from the same witness and others. *See* Testimony, House Committee on Judiciary, Subcommittee 1, HB 2955, May 18, 1983, Ex A (statement of Sen Nancy Ryles) ("Currently, a *mature 14 or 15-year-old* who commits a violent crime in Oregon will be tried as a juvenile and may or may not be institutionalized." (Emphasis added.)); *see also, e.g.*, House Floor Debate, June 18, 1985, Reel 25, Track II (statement of Rep Jim Hill) ("The bill sets forth criteria for the judge to use to protect *the child who is truly immature* and should not be treated as an adult." (Emphasis added.)).

We note that the dissent, without addressing any of the legislative history that contradicts its broad view of the sophistication and maturity criterion, references one of those general statements as an important indicator of legislative intent:

"While we have seen fit to * * * [provide] the remand option at age 16, we have not yet come to terms with those exceptional cases where a younger teenager commits a violent crime.

"And these exceptional cases do exist—

Youth's view of the statute is also difficult to reconcile with the specific concerns raised by the ACLU and JRP as to lowering the remand age. If, as youth argues, the criterion was meant as a holistic measurement of a youth's sophistication and maturity that prevented remand unless the youth possessed those qualities beyond his or her age, then that would likely address—or at least be relevant to—the ACLU's and JRP's concern that remand was inappropriate for 14- and 15-year-olds because they were impulsive, had poor judgment, and were more susceptible to peer pressure. But we can infer that those groups felt that the criteria, taken together, did not adequately address that concern. Indeed, the broad view of capacity that those groups referenced—*i.e.*, considering not just the "capacity to understand the nature and consequences of his acts and to distinguish right from wrong in reference to the charged offense," but also the ability to "conform [one's] behavior to the requirement of the law"—stands in contrast to the more restricted test of capacity that the legislature adopted as an initial hurdle before the court considers the youth's and society's best interests in deciding whether to retain jurisdiction. Testimony, House Committee on Judiciary, Subcommittee 1, SB 414, May 30, 1985, Ex D (statement of Claudia Burton).

We turn, finally, to the legislative history surrounding the changes to the waiver statutes in Senate Bill (SB) 1 (1995). Those changes were largely based on the recommendations of then-Attorney General Kulongoski's Juvenile Justice Task Force, which proposed an overhaul of the juvenile justice system. As part of that effort, the task force reviewed the implementation of Measure 11 with respect to juvenile crime and "developed recommendations for legislative action to fill in the measure's substantive and procedural

---

"For example, as of February 28, 1983, there were seven 14-year-old boys and six 15-year-old boys committed to MacLaren Training School for the type of violent crimes covered in this bill[.]"

Testimony, House Committee on Judiciary, Subcommittee 1, HB 2955, May 18, 1983, Ex A (statement of Sen Nancy Ryles). That statement, the dissent argues, shows that the waiver statute "was intended to apply only to 'exceptional cases[.]'" 268 Or App at 555 (Egan, J., dissenting). But, in arguing that the remand age should be lowered, Senator Ryles referenced "those exceptional cases where a younger teenager commits a violent crime." It was the fact that a youth under age 16 committed a violent crime that made the case exceptional, not that the court might decide to waive the youth to adult court.

gaps." Exhibit C, Senate Committee on Judiciary, SB 1, Jan 26, 1995. To remedy one of those perceived substantive gaps, the task force recommended that 12- to 14-year-olds be made eligible for waiver for murder, rape, and other serious felonies. The task force noted that youths under 15 years of age were committing "serious violent crimes," which Measure 11 did not address:

> "Under existing law, a 14-year-old murderer-rapist cannot be tried as an adult or confined in juvenile facilities beyond his or her 21st birthday, whether or not the youth is a threat to the community and likely to re-offend. With an increasing number of serious violent crimes committed by individuals under 15, this glaring omission from Measure 11 represents a continuing threat to public safety."

*Id.* Craig Campbell, task force coordinator, spoke to the task force's reasons for including those youths in SB 1:

> "The conversation * * * occurred [in the task force] relative to 12, 13 and 14 year olds * * * as things were getting close to election on Ballot Measure 11, so it was certainly taken into consideration reflecting what Ballot Measure 11 would mean. *The belief of the task force was there are certain very violent offenses that younger people are committing and for that reason they felt that it was important to make sure that those juveniles would fit into the Measure 11 consideration.* Of course they were also making that consideration based on the fact that for these violent offenses they still wanted to make sure that those 12, 13 and 14 year olds who were treated under Measure 11 would be subject to the second look. So they were not two separate considerations but were in fact the same thing. They wanted to make sure that if there was a very violent act from a 12 or 13 year old or 14 year old that they be given a sentence of more duration than they currently would get but also wanted to make sure that we gave them this second look in case they were reformable."[19]

Tape Recording, Senate Committee on Judiciary, Subcommittee on Juvenile Justice, SB 1, Mar 6, 1995, Tape 38, Side A (statement of Craig Campbell) (emphasis added).

---

[19] The second look provision, as enacted, required that those youths, "who were under 18 years of age at the time of the commission of the offense," were sentenced following waiver, and met other criteria, were to be provided a "second look" hearing after serving half of their sentence. Or Laws 1995, ch 422, § 53.

The task force observed "a growing number of incidences of [12- to 14-year-olds] committing very violent crimes," and SB 1 sought "[t]o deal with these youths * * * by add[ing] provisions allowing these youths to serve longer sentences." Exhibit A, Senate Committee on Judiciary, SB 1, Mar 16, 1995.

Apart from a technical amendment that changed the text and structure of ORS 419C.352,[20] SB 1 changed that statute to make youths under 15 subject to discretionary waiver criteria for the crimes of murder or aggravated murder, first-degree rape, first-degree sodomy, and first-degree unlawful sexual penetration. The legislative history does not show that the legislature focused on the meaning of those specific criteria, though one witness noted that those criteria were already part of the framework for discretionary waiver. *See* Tape Recording, Senate Committee on Judiciary, Subcommittee on Juvenile Justice, SB 1, Feb 24, 1995, Tape 26, Side B (statement of Michael Livingston, Department of Justice) (explaining that the findings referenced in ORS 419C.352, as amended by SB 1, were the same that the juvenile court currently had to make for discretionary waiver under ORS 419C.349).

There were, however, discussions about two issues peripheral to that change: whether 14-year-olds charged with those crimes should be automatically placed in adult court rather than be subjected to discretionary waiver (in effect extending Measure 11's requirement that 15- to

---

[20] Before the amendments of SB 1, ORS 419C.352 (1993) provided:

"A person under 16 years of age shall not be waived for disposition as an adult under ORS 419C.349 unless the child is represented by counsel during the waiver proceedings and is alleged to have committed an act or acts that if committed by an adult would constitute one or more of the following crimes."

As introduced, SB 1 changed that text by simply lowering the age of waiver. The text was later changed, however, by a "technical amendment" proposed by the Department of Justice (DOJ) that replaced the reference to "waive[r] for disposition as an adult under ORS 419C.349" and created text identical to the current text of ORS 419C.352. Exhibit B, Senate Committee on Judiciary, Subcommittee on Juvenile Justice, SB 1, Feb 22, 1995. DOJ representative Michael Livingston noted that those changes—making the reference to the waiver criteria in subsections (3) and (4) of ORS 419C.349 explicit—did not represent a substantive change. Tape Recording, Senate Committee on Judiciary, Subcommittee on Juvenile Justice, SB 1, Feb 22, 1995, Tape 23, Side A (statement of Michael Livingston, DOJ).

17-year-olds be tried as adults to 14-year-olds); and whether SB 1 should eliminate all provisions as to waiver for 12- to 14-year-olds so that the bill would be limited, as Measure 11 was, to 15- to 17-year-olds. Those proposals were discussed throughout the passage of the bill,[21] and various committees made changes as SB 1 wound through the legislature.[22] Ultimately, the House Committee on Judiciary, Subcommittee on Juvenile Justice, amended the bill to delete the section that automatically placed 14-year-olds accused of murder and other specified crimes in adult court. Minutes, House Committee on Judiciary, Subcommittee on Juvenile Justice, SB 1, May 4, 1995, 2. The legislature instead made 14-year-olds, along with 12- and 13-year-olds, who were accused of those crimes, subject to discretionary waiver, as ORS 419C.352 now reflects.

---

[21] For example, Timothy Travis, staff attorney for JRP, testified that the voters did not vote, in Measure 11, to subject juveniles who were 14 and under to adult court, subject to Measure 11 penalties, and that it was not the intent of the voters to subject any youths under 15 to adult court. Tape Recording, Senate Committee on Judiciary, Subcommittee on Juvenile Justice, SB 1, Mar 6, 1995, Tape 39, Side A (statement of Timothy Travis, JRP); *see also, e.g.*, Exhibit E, House Committee on Judiciary, Subcommittee on Juvenile Justice, SB 1, Apr 26, 1995 (explaining that Children First for Oregon opposed mandatory treatment of 14-year-olds as adults because that was "not part of the Measure 11 mandate" and recommending deleting waiver provisions for 12- and 13-year-olds because, although "[a] few juveniles as young as 12 commit serious, even heinous crimes," those youths would "otherwise would be considered emotionally and cognitively immature").

Others testified in support of allowing for remand, citing examples of 12- and 13-year-olds who had committed violent crimes and arguing that those youths should be subject to waiver into the adult system. *See* Tape Recording, Senate Committee on Judiciary, Subcommittee on Juvenile Justice, SB 1, Mar 6, 1995, Tape 38, Side B (statement of Mark McDonnell, Deputy District Attorney, Multnomah County); *id.* (statement of Bob Kouns, Oregon Crime Victims United) (offering the view that most 12- and 13-year-olds who commit violent crime "probably would not be" tried as adults, but "the fact that we can put them in the adult system or not put them in the adult system is the kind of flexibility that you want when you evaluate that type of offender").

[22] The Senate Committee on Judiciary, Subcommittee on Juvenile Justice, initially decided to amend the bill to speak only to the impact of Measure 11, deleting all sections pertaining to 12- to 14-year-olds. Tape Recording, Senate Committee on Judiciary, Subcommittee on Juvenile Justice, SB 1, Mar 8, 1995, Tape 43, Side A. Senator Jeannette Hamby, who voted to remove those sections, expressed the view that it would be better to limit SB 1 to the implementation of Measure 11 with respect to 15- to 17-year-olds; she explained that provisions directed at 12- to 14-year-olds could be inserted into another bill. *Id.* The subcommittee, however, reversed course at its next meeting and returned the deleted sections to the bill with little discussion of the change. Minutes, Senate Committee on Judiciary, Subcommittee on Juvenile Justice, SB 1, Mar 15, 1995, 2.

Nothing in the history of SB 1 shows that the legislature rethought or refashioned the discretionary waiver criteria in ORS 419C.349. Nor does any of that history reflect an intent that the juvenile court should evaluate a youth's sophistication and maturity in comparison to those older youths who are automatically subject to adult court. The legislature, concerned with younger youths who were committing violent crimes, expanded the age bracket for waiver of youths to adult court so that those could be subject to longer sentences. In doing so, the legislature left the criteria that guide the waiver decision unchanged.

## IV. CONCLUSION

The text, context, and legislative history of ORS 419C.349(3) reflect the legislature's intent to allow waiver for those youths who, by nature of their sophistication and maturity, understand what they are doing in a physical sense and understand that their actions are wrong or will likely have criminal consequences. In this case, the court found that youth demonstrated an "awareness regarding the nature of the criminal act, the degree of his participation in the criminal act, and an awareness of the consequences of the criminal act if apprehended by authorities." The evidence supports those findings.[23] The state's expert, for example, stated that youth "knew that he would be in legal trouble from his encounter with [the victim]"; he could "articulate that what he did was wrong and understands the consequences"; and he was "just as effective or more effective (because of his strong cognitive ability) in understanding that his crime was wrong and identifying alternatives

---

[23] Although the dissent does not apply its interpretation of ORS 419C.349(3) to the evidence in this case, we note that it is unclear, under the dissent's proposed interpretation of ORS 419C.349(3), whether any youths subject to waiver (or at least a 13-year-old youth) could ever be waived into adult court. In the dissent's view, the youth must "be sufficiently able to express the mental and emotional qualities of a normal, fully grown and developed, socially adjusted adult," and the court must "make findings about the youth's judgment-making ability, considering the youth's capacity to think independently in light of outside influences." 268 Or App at 552-53 (Egan, J., dissenting). But, in this case, when Nagel (who testified as to adolescent brain development but did not examine youth) was asked if a 13-year-old's brain could be developed enough to make reasoned decisions "in heated, emotional situations," she explained that "[t]here has been no evidence to suggest that a 13-year-old anywhere in the world would be the same as a mature adult."

to his actions." Youth's expert, Bolstad, agreed that, if youth had been asked by Aguilar-Mandujano to aid in the robbery and murder of the victim, as youth told police, youth could appreciate that what he was about to do was against the law and that what he was doing was potentially going to harm someone. The court did not err in finding that youth satisfied ORS 419C.349(3).

Affirmed.

**EGAN, J.,** dissenting.

The majority ultimately concludes that all that is required to "appreciate the nature and quality of the conduct involved" in the commission of a crime is that a youth "understand what they are doing in a physical sense and understand that their actions are wrong or will likely have criminal consequences." 268 Or App at 539. The majority reaches this extremely low-threshold interpretation of ORS 419C.349(3) through a mistaken analogy to the adult criminal insanity defense statute. Because the long-recognized and legislatively dictated goals of the juvenile code are not comparable to those of the adult criminal code, the majority's analogy is inapt. Moreover, an interpretive gloss pulled from the adult insanity defense statute is not needed to give meaning to the words of the juvenile waiver statute or to effectuate the intent of the legislature because ORS 419C.349(3) has a logical meaning that follows from the text and context of that statute. Consequently, I respectfully dissent.

ORS 419C.349 provides, in relevant part:

"The juvenile court, after a hearing * * * may waive a youth to a circuit * * * court * * * for prosecution as an adult if:

"* * * * *

"(3) The youth at the time of the alleged offense was of sufficient sophistication and maturity to appreciate the nature and quality of the conduct involved; and

"(4) The juvenile court, after considering the following criteria, determines by a preponderance of the evidence

that retaining jurisdiction will not serve the best interests of the youth and of society and therefore is not justified:

"(a) The amenability of the youth to treatment and rehabilitation given the techniques, facilities and personnel for rehabilitation available to the juvenile court and to the criminal court which would have jurisdiction after transfer;

"(b) The protection required by the community, given the seriousness of the offense alleged;

"(c) The aggressive, violent, premeditated or willful manner in which the offense was alleged to have been committed;

"(d) The previous history of the youth, including:

"(A) Prior treatment efforts and out-of-home placements; and

"(B) The physical, emotional and mental health of the youth;

"(e) The youth's prior record of acts which would be crimes if committed by an adult;

"(f) The gravity of the loss, damage or injury caused or attempted during the offense;

"(g) The prosecutive merit of the case against the youth; and

"(h) The desirability of disposing of all cases in one trial if there were adult co-offenders."

## I. IMMATURITY IS PROFOUNDLY DIFFERENT FROM A MENTAL DEFECT IN ADULTS

The majority draws a false analogy between the waiver statute and the adult criminal insanity defense statute. That analogy is based on the words "nature and quality." 268 Or App at 518-19. Those words are present in the waiver statute but absent from the adult criminal insanity defense statute.

ORS 161.295(1), the adult criminal insanity defense statute, provides:

> "A person is guilty except for insanity if, as a result of mental disease or defect at the time of engaging in criminal conduct, the person lacks substantial capacity either to *appreciate the criminality* of the conduct or to *conform the conduct* to the requirements of law."

(Emphases added.)

Given that the words "nature and quality" are absent from that statute, to create a connection between the adult insanity defense statute and the waiver statute, the majority relies on *State v. Dyer*, 16 Or App 247, 518 P2d 184 (1974). In *Dyer*, the majority reversed its prior interpretation of the insanity defense statute on reconsideration and held, over a dissent,[1] that the condition required to find a person guilty except for insanity under ORS 161.295(1)— that a person "lacks substantial capacity * * * to appreciate the criminality of the conduct"—was the "functional equivalent" of the former test in Oregon. 16 Or App at 257. The Oregon Supreme Court articulated that former test in *State v. Gilmore*, 242 Or 463, 468, 410 P2d 240 (1966):

> "Insanity, to excuse a crime, must be such a disease of the mind as dethrones reason and renders the person incapable of understanding the *nature and quality and consequences* of his act or of distinguishing between right and wrong in relation to such act."

(Emphasis added.)

A prior formulation of the test for incapacity due to insanity used the phrase "nature and quality and consequences." The current statute does not use that phrase. The use of two words does not persuade me that the adult insanity defense statute ought to be used as a template for the juvenile waiver statute.[2] This is especially so because,

---

[1] The dissent rejected the conclusion that the phrase the person "lacks substantial capacity * * * to appreciate the criminality of the conduct" was the functional equivalent of the former test. *Dyer*, 16 Or App at 265-66 (Thornton, J., dissenting).

[2] The majority also argues that the words "nature and quality" have been imbued with special meaning by the early history of the common-law insanity defense. 268 Or App at 518-19. However, that argument fails to address the critical distinction between a lack of capacity due to a disease or defect and a lack of capacity due to inadequate sophistication and maturity, which I discuss more fully below.

as explained below, the juvenile code is *sui generis* and contains legislatively mandated policies that starkly diverge from those of the criminal code. Moreover, the words "nature and quality" in the waiver statute have a logical meaning, independent of any analogy to the adult criminal code, that follows from the text and context of that statute. As we have long recognized, the statute's text is "the best evidence of the legislature's intent." *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610, 859 P2d 1143 (1993).

## A. *"Nature and quality" within the context of the waiver statute*

A comparison of the words of the adult insanity defense statute to the words of the waiver statute demonstrates their stark difference. The adult insanity defense statute is concerned with the effects of a "disease or defect" on a person's "capacity,"[3] whereas the waiver statute is concerned with "sophistication and maturity." To say it another way, the adult insanity defense addresses *impaired* adult minds, while the waiver statute deals with *undeveloped* juvenile minds. The majority's definition of "nature and quality" nullifies that distinction. It is only after nullifying that critical distinction that the majority can reach the conclusion that the youth waiver statute is analogous to the adult insanity defense statute.

That distinction is crucial. A youth's ability to know that something is wrong or criminal bears little relationship to the adult-like qualities denoted by the words "sophistication and maturity." 268 Or App at 516 (concluding that the words "sophistication and maturity," in isolation, "describe qualities that are associated with a normal well-adjusted adult"). Put another way, if a 13-year-old did not know that murder was wrong or criminal, we would not think that the youth's problem was one of "sophistication and maturity." We might, of course, think that the youth's problem related to a "disease or defect," but the waiver statute does not use that language. The majority's reduction of "nature

---

[3] As relevant here, the dictionary defines "capacity" as "**2** : legal qualification, competency, power, or fitness." *Webster's Third New Int'l Dictionary* 330 (unabridged ed 2002).

and quality" to wrongfulness and physicality[4] is inconsistent with the meaning of the other words used in the statute—that is to say, the majority's proffered interpretation of ORS 419C.349(3) does not make sense in the context of that statute.[5] We must interpret the meaning of the words in a statute as used in context. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009).

Turning to examine ORS 419C.349(3) within the context of the remainder of the waiver statute, it is apparent that subsection (3), relating to a youth's "sophistication and maturity," is intended to combine with subsection (4), which contains a list of best-interest factors, to form a two-part test. Likewise, it is apparent that the best-interest factors in subsection (4) do not address development and, therefore, subsection (3) is the only portion of the waiver statute that allows courts to inquire into a youth's developmental capacity.[6] The majority's interpretation of ORS 419C.349(3) sets the bar so low that this inquiry loses nearly all significance. Such an interpretation of ORS 419C.349(3) is inconsistent with the context of the statute.

The legislature isolated the developmental capacity inquiry in subsection (3) from the best-interest factors inquiry in subsection (4). This is significant because a factor test requires a court to consider a combination of criteria and weigh each criterion against the others. By removing

---

[4] To be sure, the majority's formulation of wrongfulness—an "understand[ing] that [a youth's] actions are wrong or will likely have criminal consequences"—and the majority's formulation of physicality—an "understand[ing of] what [a youth is] doing in a physical sense"—is more detailed than my shorthand reference to wrongfulness and physicality. However, for clarity, I use these shorthand references throughout the remainder of this dissent.

[5] As explained below, 268 Or App at 550-51 (Egan, J., dissenting), I agree with the majority that wrongfulness and physicality are part of the nature and quality of the criminal conduct here. I include this example to demonstrate that considering only the youth's intellectual appreciation of the wrongfulness and physicality of the conduct—without also considering the youth's appreciation of other aspects of the conduct—leads to a result that does not comport with the context of the statute.

[6] The majority agrees that ORS 419C.349(3) is focused on capacity. 268 Or App at 517. However, because of its reliance on the adult criminal insanity defense statute, the majority concludes that incapacity in the waiver statute is equal to that caused by a disease or defect. Instead, because the waiver statute uses the words "sophistication and maturity," I would conclude that the capacity inquiry required by the waiver statute relates to a youth's development.

the developmental capacity inquiry from the factor test, the legislature confirmed that a youth's developmental capacity is of primary importance to the waiver statute and requires a court's exclusive consideration. In other words, a court must confront the developmental capacity inquiry squarely on its own terms, before balancing the best-interest factors.[7] The majority's interpretation of ORS 419C.349(3), which downplays the significance of the developmental capacity inquiry, belies the primary role that the inquiry plays in the structure of the waiver statute.

B. *The waiver statute within the context of juvenile law*

The legislature's decision to make the developmental capacity inquiry primary in the waiver statute is in conformity with the long-recognized distinction between the juvenile code and the criminal code in Oregon law. The Oregon Supreme Court thoroughly analyzed the history of the treatment of juvenile offenders under Oregon law in *State ex rel Juv. Dept. v. Reynolds*, 317 Or 560, 857 P2d 842 (1993).[8]

---

[7] The legislative history makes explicit what is implicit in the structure of the statute. Senator Nancy Ryles, the primary proponent of changes to the waiver statute that would eventually become ORS 419C.349(3) (then known as remand), explained her preference for isolating the sophistication and maturity criterion from the best-interest factors:

"I feel it is a much stronger protection for juveniles in this position rather than being listed with the [best-interest] criteria. This clause would have the effect of <u>eliminating any consideration of remand</u> if, for example, the juvenile was retarded, too immature to understand the nature of the act, etc."

Testimony, House Committee on Judiciary, HB 2955, June 6, 1983, Ex P (statement of Sen Nancy Ryles) (underscoring in original). Moreover, Julie McFarlane of Juvenile Rights Project testified that she agreed with Senator Ryles that isolating the sophistication and maturity criterion gave it more emphasis and was "a good idea." Tape Recording, House Committee on Judiciary, HB 2955, June 6, 1983, Tape 408, Side A (statement of Julie McFarlane, Juvenile Rights Project).

[8] Following a reference to Professor LaFave's opinions on formulations of tests for criminal capacity, the majority cites *Reynolds* for the proposition that "it is likely that Oregon applied the common law rule" regarding crimes committed by juveniles. 268 Or App at 525 n 8. Prior to statehood, this may have been the case. *See Reynolds*, 317 Or at 566 (discussing law in effect before 1859). However, the legislature abrogated those rules in the late 19th century. The state's approach to juvenile prosecution then evolved through legislation for another roughly 70 years before the legislature recodified the juvenile code in 1959 into a *sui generis* system with exclusive jurisdiction over youth. *Id.* at 567-70. Consequently, if Oregon ever followed a common-law approach to developmental capacity, it has not done so for well over 100 years.

Aside from restating that the juvenile code is civil, not criminal, *id.* at 567 n 6, the court concluded:

> "Without exception, this court's cases support the conclusion that the Oregon juvenile justice system always has been focused on the rehabilitation of delinquent youth. *See, e.g., State v. Gullings,* 244 Or 173, 177, 416 P2d 311 (1966) (juvenile court salvages and guides rather than punishes); *Hills v. Pierce,* 113 Or 386, 231 P 652 (1925) (the purpose of juvenile court is not to convict or punish but to protect); *State v. Dunn,* [53 Or 304, 309-10, 99 P 278 (1909)] (juvenile court treats delinquent children not as criminals but as wards to be protected); *State v. Eisen,* 53 Or 297, 300, 99 P 282 (1909) (general purpose of juvenile code is not to punish, but to reform)."

*Id.* at 568. Then, despite the apparent "trend in the United States * * * toward the 'crime control' model of juvenile justice, especially for children who are involved with drugs, gang activity, or physical violence," the court recognized that Oregon remained faithful to its emphasis on rehabilitation and cited to the predecessor waiver statute as an example of that faithfulness. *Id.* at 568 n 7 (citing *former* ORS 419.533 (1985), *renumbered as* ORS 419C.349 (1993), the predecessor of the current waiver statute). The current text of ORS 419C.349(3) mirrors that of the predecessor statute. *Compare* ORS 449.533 (1985) *and* ORS 419C.349(3). Given the divergent goals of the juvenile code and the adult criminal code, the majority's analogy to the adult criminal insanity defense statute is a questionable source of meaning at best, and it is a particularly inapt analog to the waiver statute, which embodies the rehabilitative policy of the juvenile code. *Reynolds,* 317 Or at 568 n 7.

The distinction in Oregon law between the juvenile and adult criminal code aligns with, and has been informed by, a similar distinction in federal constitutional law.[9] This

---

[9] As summarized in *Kent v. United States,* 383 US at 554-55, the theory of juvenile courts is

"rooted in social welfare philosophy rather than in the *corpus juris.* Its proceedings are designated as civil rather than criminal. The Juvenile Court is theoretically engaged in determining the needs of the child and of society rather than adjudicating criminal conduct. The objectives are to provide measures of guidance and rehabilitation for the child and protection for society,

is particularly the case with regards to ORS 419C.349(3), which quotes language approved by the United States Supreme Court in *Kent v. United States*, 383 US 541, 86 S Ct 1045, 16 L Ed 2d 84 (1966).[10] *Kent* is the beginning of a string of United States–Supreme Court cases interpreting the limits of the state's ability to prosecute and sentence youths. A more recent case in this line, *Roper v. Simmons*, 543 US 551, 125 S Ct 1183, 161 L Ed 2d 1 (2011), echoes the concerns expressed in *Kent*, and reasons that, because juveniles have lessened culpability due to their youth, they are less deserving of the most severe punishments. As compared to adults, the court noted that juveniles have a "'lack of maturity and an underdeveloped sense of responsibility'"; they "are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure"; and their characters are "not as well formed." *Id.* at US 569-70. In *Graham v. Florida*, 560 US 48, 68, 130 S Ct 2011, 176 L Ed 2d 825 (2010), the court reached a similar conclusion based, in part, on the fundamental differences between adolescent and adult brains. (Citing the brief for the American Medical Association and the American Academy of Child and Adolescent Psychiatry as *Amici Curiae*.)

Similar to federal law, Oregon law distinguishes between youths and adults who engage in criminal conduct, because juveniles do not have the same developmental capacity as adults. *See Reynolds*, 317 Or at 566 (discussing early notions of youths' criminal capacity in Oregon); *State ex rel Juv. Dept. v. Fitch*, 192 Or App 56, 64, 84 P3d 190 (2004) (concluding that, under the juvenile code, youths are not "criminally responsible for their conduct"). Similarly, because youths are not culpable in the same sense as adults and are considered amenable to rehabilitation, the juvenile code focuses on rehabilitation and not punishment. *See generally Reynolds*, 317 Or at 367-70 (tracing the history and policy of the juvenile code); ORS 419C.001 (outlining the rehabilitative policy of the juvenile code).

not to fix criminal responsibility, guilt and punishment. The State is *parens patriae* rather than prosecuting attorney and judge."

[10] Among previous criteria used by the District of Columbia Juvenile Court cited with approval by the *Kent* court, is a criterion which instructs courts to consider a youth's "sophistication and maturity." 383 US at 567.

Oregon law and federal constitutional law have long been in conformity with the conclusions that science has only more recently reached through the development of brain imaging technology. According to the American Medical Association's summary of recent research into brain development, adolescent "brains are physiologically underdeveloped in the areas that control impulses, foresee consequences, and temper emotions. They handle information processing and the management of emotions differently from adults." Brief of the American Medical Association *et al.* as *Amici Curiae* at 5, *Roper*, 543 US 551. Because of the particularities of an adolescent's brain development, "stress, emotions, and peer pressure * * * operate on the adolescent mind differently and with special force." *Id.* at 7-8. In terms of decision making, adolescents rely on the amygdala, "the area of the brain associated with primitive impulses of aggression, anger, and fear," whereas adults "tend to process similar information through the frontal cortex, a cerebral area associated with impulse control and good judgment," and, moreover, "the regions of the brain associated with impulse control, risk assessment, and moral reasoning develop last, after late adolescence." *Id.* at 11. Thus, according to the American Medical Association, "adolescents are not simply miniature adults, with less experience or wisdom. They are also not as equipped as adults to engage in moral reasoning and adjust their conduct accordingly." *Id.* at 21.

Science confirms the fact that adolescents are fundamentally different from adults when it comes to criminal capacity—a fact that Oregon law has recognized for over 100 years, and a fact that our courts have repeatedly reconfirmed throughout the history of the juvenile code and earlier laws related to youthful offenders. *See Reynolds*, 317 Or at 567-70 (analyzing pre-1993 cases related to Oregon's policies regarding youths who engage in criminal conduct); *Fitch*, 192 Or App at 64 (concluding that youths are not "criminally responsible for their conduct"). Of course, the courts cannot take credit for any premonition concerning the development of scientific data. Rather the legislative assemblies, juvenile authorities, and courts have all understood a deep psychological and spiritual truth: The manner in which we treat children defines us as a people; if we sow the fashionable and tawdry political wind of retribution toward juveniles,

we reap the whirlwind of inhumanity waged against us all as citizens. There must be a distinction between adults and children. The waiver statute is an embodiment of that distinction. *Reynolds*, 317 Or at 568 n 7. An interpretation of the waiver statute that depends on the adult criminal code is, therefore, fundamentally mistaken.

To summarize, examining ORS 419C.349(3) in the context of the other provisions in the youth waiver statute, the legislature's intention to make the developmental capacity inquiry contained in that subsection exclusive and primary is clear. Next, examining the waiver statute within the context of the juvenile code as a whole, it is clear that the juvenile code is premised on, and primarily concerned with, the goal of rehabilitation and the distinction between youths and adults—a distinction which is echoed in federal constitutional law and buttressed by the science of brain development. Under the majority's interpretation—with its dependence on the adult criminal insanity defense statute—we would have to infer that the legislature wished to abrogate the distinction between the juvenile and the criminal code in the case of the waiver statute. Were this the case, the legislature could have easily said so, but it did not. Barring contrary evidence of legislative intent, we do not infer intent from silence. *State v. Hess*, 342 Or 647, 660-61, 159 P3d 309 (2007).

## II. INTERPRETING THE TEXT OF THE STATUTE IN THE CASE AT HAND

As noted above, the majority depends on the words "nature and quality" for its analogy to the adult insanity defense statute. 268 Or App at 518-19. It is unnecessary to use that mistaken context to interpret those words because the meaning of the words follows logically from their use in the context of the waiver statute.

According to their dictionary definitions, both words relate to the "essential character" of a thing.[11] The

---

[11] Examining the plain meaning of the words "nature and quality," I agree with the majority that the most applicable definition of "nature" is "the essential character or constitution of something." *Webster's* at 1507; 268 Or App at 517-18. I also agree that "quality" is best defined for the purpose of this statute as a "peculiar and essential character." *Webster's* at 1858; 268 Or App at 517-18. However, I strongly disagree that those definitions are of limited guidance. 268 Or App at 518.

thing that "nature and quality" relate to in this statute is the "conduct involved" in the commission of the crime. Thus, our task of interpreting the plain meaning of "the nature and quality of the conduct involved" reduces to the question, what is essential to the criminal conduct at issue? That question may appear to present a vexing problem, but the solution is simple: We ask whether, if we removed an aspect from the conduct, that conduct would still be criminal. If, once an aspect is removed from the calculus, the conduct is no longer criminal, then that aspect must be essential.

Notably, the legislature instructed courts to consider whether a youth could appreciate the "conduct involved" in the particular crime. Consequently, depending upon the conduct at issue, the essential character of the conduct that the youth must appreciate may differ. Therefore, when applying the test outlined above, we must use a concrete example to determine what is included in the "nature and quality" of a particular type of criminal conduct.

Here, the alleged criminal conduct was murder and the majority identifies youth's understanding of what he is "doing in a physical sense" to be part of the "nature and quality" of that conduct. Applying the test for "nature and quality" outlined above, we would ask, if a person killed another but did not understand what he was doing in a physical sense, would the conduct be criminal? Murder requires intent, and a person who does not know what he is doing in a physical sense lacks intent. Therefore, physicality is part of the essential character of that criminal conduct, and thus, part of its "nature and quality." The same is true for the wrongfulness of the conduct—also identified by the majority—because if the conduct was not wrongful, it would not be criminal. Moreover, in person-to-person crimes, the "nature and quality" of the criminal conduct must also include the effect on the victim. This is so because person-to-person crimes necessarily involve victims, and if the victims were not affected, the conduct would not be criminal.

I agree with the majority that the meaning of "appreciate" "encompasses both an intellectual and emotional component." *Dyer*, 16 Or App at 258; 268 Or App at 520-21. Consequently, because the effect on the victim, along

with wrongfulness and physicality, is part of the nature and quality of the criminal conduct, in order to "appreciate the nature and quality of the conduct involved," the youth must possess an emotional and intellectual understanding of the effect on the victim.

That reading of "appreciate" parallels the majority's conclusion that "appreciate" includes an intellectual and emotional understanding of the consequences of one's actions. *Id.* However, because the majority depends so heavily on an analogy to the adult insanity defense statute, it subsequently reduces its discussion of an appreciation of the consequences of the youth's conduct—here, murder—to a mere intellectual understanding of the legal consequences of the conduct—*i.e.*, an understanding that the conduct was wrong or criminal. Put differently, the majority acknowledges that a youth must have an emotional understanding of the consequences of the crime, but drops that requirement from its final analysis, and instead focuses its analysis solely on the consequences of the crime *for the murderer.* The consequences of murder are greater than the mere legal consequences for the murderer.

Furthermore, the plain meaning of "appreciate" relates to judgment-making. According to the dictionary, "appreciate" means "1 a *** (2) : to judge or evaluate the worth, merit, quality, or significance of : comprehend with knowledge, judgment, and discrimination." *Webster's Third New Int'l Dictionary* 105 (unabridged ed 2002); 268 Or App at 516. Consequently, in addition to possessing an emotional and intellectual understanding of the effect on the victim and other consequences of the crime, a youth must also be able to make judgments about that effect.

Turning to sophistication and maturity, I agree with the majority that the plain meaning of "sophistication" and "maturity" "describe qualities that are associated with a normal well-adjusted adult." *Id.* However, I believe that the majority does not sufficiently heed the significance of those terms in relation to the rest of the statute.

"'Sophistication' means 'the quality or state of being sophisticated' and 'the quality or the character of

being intellectually sophisticated (as through cultivation, experience, or disillusionment)'" and "sophisticated" is defined as "deprived of native or original simplicity: as * * * **b** : WORLDLY-WISE, KNOWING <a ~ adolescent>." *Id.* (quoting *Webster's* at 2174).

Maturity is "the quality or state of being mature : full development * * * < ~ of judgment> * * *." *Webster's* at 1395. Mature is defined as

> "**2 a** : having attained the normal peak of natural growth and development : fully grown and developed * * * **c** : *having or expressing the mental and emotional qualities that are considered normal to an adult socially adjusted human being* <a ~ outlook> <parents were willing to be ~, to take responsibility –H.S.Canby>"

*Id.* at 1394 (emphasis added). Thus, under ORS 419C.349(3), the juvenile must possess "sufficient" intellectual sophistication derived from experience *and* be sufficiently able to express the mental and emotional qualities of a normal, fully grown and developed, socially adjusted adult. Because the court must make findings about a youth's sophistication and maturity, ORS 419C.352(2), those findings must take into account whether the youth possesses enough of the intellectual sophistication derived from experience *and* the ability to express the mental and emotional qualities of a normal, fully grown and developed, socially adjusted adult to meet the demands of a specific situation, *i.e.,* to appreciate the nature and quality of the conduct involved.

In placing all of the above together, I agree with the majority that, when contemplating whether a youth, because of his or her sophistication and maturity, is able to appreciate the nature and quality of his or her conduct, a court must make findings regarding (1) whether the youth understood what her or she was doing in a physical sense and (2) understood that that the conduct was wrong. However, at least in the case of person-to-person crimes, the inquiry does not end there. The court must also make findings regarding the youth's intellectual and emotional understanding of the effect on the victim and other consequences of the conduct; this inquiry must, therefore, necessarily take into account (3) the youth's empathetic capacity. Last, (4) a court must

also make findings about the youth's judgment-making ability, considering the youth's capacity to think independently in light of outside influences. Furthermore, by the terms of the statute, these findings must be made regarding "[t]he youth at the time of the alleged offense."

Those elements of ORS 419C.349(3) follow from the plain meaning of the text used in the context of the statute; additionally, they also align with the science of brain development, which shows that—due to the physical structure of adolescent brains—teenagers and younger juveniles have a limited capacity to make moral judgments and experience empathy, and are particularly susceptible to peer pressure. Given that the science of brain development confirms our commonsense understanding of human development, it is not surprising that Oregon law and federal constitutional law have long been in conformity with the conclusion that researchers have, only more recently, reached through the development of brain-imaging technology.

## III. LEGISLATIVE HISTORY

Finally, recognizing that the legislative history of the waiver statute should be given little weight compared with the statute's text and context, *Gaines*, 346 Or at 172-73, I nonetheless turn to the legislative history to explain the differences between my reading of that history and the majority's. I agree that the majority correctly focuses on the early history of the sophistication and maturity criteria. That history begins in 1983 with the proposed amendments to *former* ORS 419.533 that were aimed at reforming the waiver process then known as "remand." As I explain in more detail below, my review of that history persuades me that the majority's reading is too reductive and fails to take into account the context of the legislative debate. Specifically, the majority's reading ignores the fact that the legislature was committed to the rehabilitative policy of the juvenile code and mindful of its distinction from the criminal code and was focused on creating a system for individualized consideration of a youth's developmental capabilities. Further, the majority's reading discounts legislators' statements that waiver is intended to apply only in exceptional cases.

The legislative history of *former* ORS 419.533 confirms that the legislature was acutely aware of the distinction between the juvenile code and the criminal code. The concerns that spurred the 1983 reform efforts led by Senator Ryles grew out of the "general philosophy" of the juvenile system to focus on rehabilitation. As expressed by Senator Ryles, "juveniles *may be lacking in understanding or information and therefore may not be fully responsible for the crime they have committed*; and that they should not be typed by past misdeeds but should have the opportunity to grow and change." Testimony, House Committee on Judiciary, Subcommittee 1, HB 2955, May 18, 1983, Ex A (statement of Sen Nancy Ryles) (emphasis added).[12]

The legislature was also mindful of the need for individualized consideration of a youth's developmental capabilities. Senator Ryles discussed the criteria that would ultimately become ORS 419C.349(3) and (4), explaining that the criteria were designed to "protect[] those who truly are not maturing or are not sophisticated enough to understand the gravity of their act—regardless of their chronological age." Testimony, Senate Committee on Judiciary, SB 414, Apr 25, 1985, Ex B (statement of Sen Nancy Ryles). She added:

> "It is not realistic to say that a 14 or 15 year-old is not sufficiently mature to understand the gravity of a violent crime, while a 16 year-old is. We cannot persist in totally defining juveniles by an arbitrary age limit, ignoring the fact that *maturation is a gradual process* and that *some 14 and 15 year-olds may well understand the serious nature of the violent crime they have committed, while others may not.*"

*Id.* (emphasis added).

---

[12] The majority discounts statements such as this as an "additional example" of a "nonspecific statement[] that could be stretched to aid youth's argument in a general way." 268 Or App at 534-35 n 18. Unlike the majority, I do not discount that and other similar statements, because, when viewing the totality of the legislative history, in light of the particular context in which the statements were made, the statements provide a good indication of the legislature's views with regard to the discretionary criteria in general, and, more specifically, that, in enacting the bill that lowered the age of waiver, there was an intent to retain the distinction between the juvenile and adult systems, curtail abuse of the waiver option, and provide an even-handed rational basis on which judges could base waiver decisions.

Perhaps most importantly, the legislative history further indicates that legislators were sensitive to the fact that waiver was intended to apply only to "exceptional cases," and that the bill was the exception to the general rule that the juvenile court would retain exclusive, original jurisdiction over most juveniles. Testimony, House Committee on Judiciary, Subcommittee 1, HB 2955, May 18, 1983, Ex A (statement of Sen Nancy Ryles). Senator Ryles stated that, although "we have not yet come to terms with those exceptional cases where a younger teenager commits a violent crime," those "exceptional cases" "represent a very small percentage of all juvenile arrests," but they do exist. *Id.*

In sum, the legislature considered and crafted language that recognized the need to retain the distinction between the juvenile system and the adult criminal system, which involves an individualized consideration of a youth's developmental capabilities—and not just a low-threshold inquiry of the youth's intellectual ability to "know" or "understand" that he or she committed a criminal act. Further, the legislative history confirms that waiver was intended to apply only to those "exceptional cases" in which the court had considered the youth's developmental capacity. In contrast to those legislative concerns, the low threshold developed by the majority—an intellectual understanding of the wrongfulness of the conduct and that the youth physically engaged in the conduct—will ensure that all but the most developmentally challenged youths will be capable of being waived into the adult criminal system, as long as the youth's conduct constituted one of the enumerated crimes if charged as an adult.

Accordingly, I dissent.

Ortega, J., joins in the dissent.